836 So.2d 915 (1999)
Shonelle Andre JACKSON
v.
STATE.
CR-97-2050.
Court of Criminal Appeals of Alabama.
May 28, 1999.
Rehearing Denied July 9, 1999.
*925 Bryan A. Stevenson and Randall Scott Susskind, Montgomery, for appellant.
Bill Pryor, atty. gen., and Kathryn D. Anderson, asst. atty. gen., for appellee.
BASCHAB, Judge.
The appellant, Shonelle Andre Jackson, was convicted of capital murder for the killing of Lefrick Moore. The murder was made capital because it occurred during the commission of a robbery in the first degree. See  13A-5-40(a)(2), Ala.Code 1975. The appellant was also convicted of first-degree theft of property for stealing a vehicle owned by Lottie Flowers. See  13A-8-3, Ala.Code 1975. After a sentencing hearing, the jury recommended, by a vote of 12-0, that the appellant be sentenced to life imprisonment without the possibility of parole for the murder of Lefrick Moore. The trial court overrode the jury's recommendation and sentenced the appellant to death by electrocution for the capital offense.[1] The trial court also sentenced the appellant, as a habitual offender with three prior felony convictions, to life imprisonment for the theft conviction. See  13A-5-9(c)(2), Ala.Code 1975.
The evidence showed that, on April 25, 1997, the appellant, Antonio Barnes, Eric Williams, and Christopher Rudolph were riding around the western area of Montgomery in a stolen, gray Buick LeSabre automobile. The appellant had previously asked Barnes to steal a vehicle for him, and Barnes had done so. The appellant was driving, and the men were looking for a person named "Cocomo," who had slapped the appellant the previous night. The appellant, Barnes, and Rudolph were armed with pistols, and Williams was armed with a shotgun.
As they were riding around, the young men noticed that Lefrick Moore, who was driving a red Chevrolet Caprice automobile, had a good stereo system in his vehicle, and they decided to rob him. They followed him for some time. While they were following Moore, the appellant purchased a soft drink from a Dairy Queen restaurant. When they were on the service road leading into the Smiley Court housing area, the appellant pulled the Buick in front of Moore's vehicle, causing Moore's vehicle to hit the Buick. The appellant got out of the Buick and shot at Moore. Williams also fired the shotgun. *926 Moore and his passenger, Gerard Burdette, got out of their vehicle and ran. Burdette ran to the Sylvest Farms plant to get help. Moore, who had been shot, fell facedown in the street and died. The coroner testified that the cause of death was a gunshot wound to his chest. Based on these events, the appellant, Barnes, Williams, and Rudolph were indicted for capital murder in connection with Moore's death.
The evidence showed that Lottie Flowers' gray 1991 Buick LeSabre was stolen on April 25, 1997, from the parking lot of the Brookview Apartments. When police later recovered it, it had a broken window, a broken steering column, and a dent on the passenger side. Officers also recovered a Dairy Queen cup from the vehicle. Testimony indicated that it was the vehicle driven by the appellant and his codefendants in connection with the murder.
Victoria Moss testified that, on April 25, 1997, as she was driving near the Smiley Court area, she saw a gray car "cut" in front of a red car. Shortly thereafter, one of the occupants of the red car got out of the vehicle and ran toward a nearby housing area. She also saw someone, who was later identified as the victim, running toward her vehicle, but he fell facedown in the street before he reached her vehicle. She went to check on the man, but the gray car started coming toward her very quickly. She ran out of the road and into the grass until the gray car drove away. She checked on the victim and then went to get help.
Leroy Geary, who was employed nearby at the Sylvest Farms plant, also saw the gray car "cut" in front of the red car and run the red car into the curb. He then saw someone fire a weapon at the red car from the driver's side of the gray car. He described the shot as a loud bang, like one from a shotgun, and stated that it was quickly followed by the sound of shattering glass and what sounded like at least two rounds fired from a pistol. He also observed someone, who was later identified as Burdette, running toward the Sylvest Farms facility. Burdette stated that he had been in one of the vehicles involved in the confrontation.
A.C. Porterfield owns a farm on Old Hayneville Road. In April 1997, he saw the victim's vehicle parked in the pasture on his farm and saw three young black men walking around the vehicle. He told them to leave, and he telephoned a friend who worked for the Montgomery Police Department.
During their investigation of the murder, police officers found an empty .380 MagTech brand shell casing at the scene of the murder; amber glass in the road at the crime scene that matched the blinker light on the victim's car; a box containing 35 unfired rounds of .380 MagTech brand ammunition from the appellant's residence; Flowers' vehicle, which had a broken steering column, a broken window, and a dent in the side; a Dairy Queen cup in Flowers' vehicle; the front of a stereo on a car parked beside the victim's car in Porterfield's pasture; and the victim's vehicle, from which the stereo was missing. The police also recovered the victim's stereo from Williams' girlfriend's residence.
Joe Saloom, a firearms and toolmarks examiner employed by the Alabama Department of Forensic Sciences, examined the empty shell casing found at the scene of the murder, the bullet recovered from the victim's body, and the box of ammunition found at the appellant's residence. He testified that the empty shell casing was a MagTech shell, like the ones in the box recovered from the appellant's residence. He explained that the bullet recovered from the victim's body was a fired "jacketed" bullet that was consistent with *927 .380 caliber. He also testified that it would have been consistent with coming from the empty shell casing the officers recovered from the scene. He further explained that the shell casing would have been ejected when the gun was fired.
Antonio Barnes, who is also known as Deon Barnes, testified that the appellant asked him to steal a car for him and that they left Trenholm Court and went to the Brookview Apartments to do so. While there, he broke the back window and the steering column and stole Lottie Flowers' gray 1991 Buick LeSabre. The appellant was with him at the time, but he rode back to Trenholm Court with another person. Barnes drove the car back to Trenholm Court and met the appellant, who then started driving the vehicle. While there, they picked up Christopher Rudolph and Eric Williams. Barnes had a .357 magnum handgun the appellant had given him earlier, the appellant had a .380 pistol, Rudolph had a 9mm pistol, and Williams did not have a weapon. They went by Barnes' sister-in-law's house, where they obtained a shotgun for Williams.
The appellant told Barnes that Cocomo had slapped him at a club and that he wanted to "holler at" Cocomo, so they drove around the western part of Montgomery looking for Cocomo. Barnes testified that they drove around for about 20 to 30 minutes looking for Cocomo, but that they did not find him. They then drove to the Smiley Court area, where they saw the victim driving his vehicle. Rudolph recognized the car and told them that the car had a good stereo system. At that point, the appellant told the other three that they were about to rob the victim. Barnes and Rudolph asked the appellant to take them back to Trenholm Court, but the appellant refused to do so.
The appellant followed the victim for a while and, during that time, bought a soft drink from Dairy Queen. When they were on the service road leading to Smiley Court, the appellant sped around the victim's vehicle and cut in front of it, causing the victim's vehicle to run into the Buick. The appellant and Williams jumped out of the vehicle with their weapons, and Barnes heard two shots. He saw the victim and his passenger running away from the vehicle. Barnes and Williams then got into the victim's vehicle, drove it to a farm off Old Hayneville Road, and parked it in a pasture. Williams pulled the stereo out of the vehicle and went through the trunk of the vehicle. They left the victim's vehicle parked in the pasture.
Barnes testified that, when he saw the appellant the next day and told him the victim had died, the appellant did not seem worried about it. Instead, he wanted to know where the victim's vehicle was. The appellant, Barnes, and another person went to the pasture where the vehicle was parked. The appellant stated that he wanted to take the motor out of the vehicle and strip the rest of the vehicle. However, Mr. Porterfield arrived about that time, and they left before they could strip the vehicle.
Eric Williams testified that, on the day of the murder, the appellant asked him if he knew how to steal a car. He responded that he did not, but told him Antonio Barnes did. Later, the appellant and Barnes approached him driving a gray Buick, and he got into the vehicle with them. Rudolph also got into the vehicle with them. The appellant was driving and had a .380 pistol with him. Barnes and Rudolph also had weapons. Because Williams did not have a weapon when he got into the car, they retrieved a shotgun for him.
Williams testified that a person named Cocomo had previously slapped the appellant. He, the appellant, Barnes, and Rudolph *928 rode around looking for Cocomo because the appellant wanted to talk to Cocomo about slapping him. They saw Cocomo at one point, but Cocomo did not stop his vehicle. After that, the appellant told the three passengers he wanted to rob someone. Williams asked the appellant to take him back to Trenholm Court, but the appellant refused to do so.
As they were driving, they saw the victim, who was driving a red Chevrolet Caprice. At that point, the appellant told them they were going to rob him. They followed the victim for a while, during which time the appellant purchased a soft drink from Dairy Queen. On the service road leading into Smiley Court, the appellant pulled the Buick in front of the victim's vehicle, and the victim's vehicle ran into the Buick. The appellant jumped out, started shooting, and said, "M___ f___, no need in you running now." (R. 385.) The victim and his passenger got out of the Caprice and ran. Williams heard two shots. When he saw cars approaching the scene, he shot the shotgun into the air. After the shooting, Williams and Barnes got into the victim's vehicle and left. Williams was driving. They drove to Old Hayneville Road and parked the vehicle in a pasture. He testified that Barnes took the stereo out of the vehicle and that they left the vehicle parked in the pasture and returned to Trenholm Court.
When Williams saw the appellant again that night, the appellant was returning from a club. The next day, when he told the appellant that the victim had died, the appellant responded that he "didn't give a f___ because he didn't stay where we stayed at." (R. 392.)
Christopher Rudolph also testified about the events surrounding the murder. He got into the gray Buick, which the appellant was driving. At that time, he had a 9mm pistol, the appellant had a .380 pistol, and Barnes had a .357 magnum handgun. Williams did not have a gun. However, the appellant asked Rudolph if he had another gun because he and Williams had some business to take care of with a person named Cocomo. They picked up a shotgun he owned and gave it to Williams, and then drove around the west side of Montgomery looking for Cocomo. They saw Cocomo at one point, but he drove away.
Rudolph remembered a discussion about committing a robbery, but he did not remember who initiated the discussion. When they were near the Smiley Court area, they saw the victim. He noticed loud music coming from the victim's car. The appellant said he wanted to rob the victim, so they followed his car for a while. While they were following the victim, the appellant bought a soft drink from a Dairy Queen. When they were on the Smiley Court service road, the appellant pulled the Buick in front of the victim's vehicle, causing the victim's vehicle to hit the Buick. The appellant got out and shot once, breaking the glass in the victim's vehicle. The victim and his passenger ran away from the victim's vehicle. Williams then got out of the car and shot into the air. The appellant got back into the car and drove to where the victim had fallen facedown in the street. The appellant stated that he wanted to go through the victim's pockets, but Rudolph stopped him from doing so. Thereafter, he and the appellant went by a club, but it was closed, so the appellant dropped him off and left. He did not see the appellant again after that.
Detective Andrew Signore, who was employed by the Montgomery Police Department, led the investigation in the case. He testified that Barnes, Williams, and Rudolph turned themselves in and made statements to the police about the murder. *929 Barnes made a statement on April 27, 1997, and Williams and Rudolph made statements on April 28, 1997.
Signore testified that the appellant voluntarily went to the police station on April 29, 1997, at approximately 2:05 p.m. Signore advised the appellant of his Miranda rights at approximately 2:16 p.m., and the appellant voluntarily waived those rights. Detective C.D. Phillips was present the entire time. Signore testified that neither officer made any threats or promises to the appellant. While there, the appellant gave several different accounts about what happened on the day of the murder. He initially denied any involvement in the murder and denied being with the three codefendants at the time of the murder. However, he admitted that he had been with one of the codefendants earlier in the afternoon or evening looking for Cocomo.
Signore then told the appellant that the officers had recovered a Dairy Queen cup from Flowers' vehicle and that his fingerprints were on the cup. At that point, the appellant admitted he had been in Flowers' vehicle, but he denied being involved in the murder. Signore testified that the appellant needed a "reality check" because the other codefendants had already all testified that the appellant had been driving the stolen vehicle and had stopped at Dairy Queen to buy a drink. Although he knew that the officers had recovered a Dairy Queen cup from the vehicle, he did not know whether the appellant's fingerprints were on the cup. The appellant then admitted that he had asked Barnes to steal a vehicle, that he went to the Brookview Apartments with Barnes to steal the Buick, and that he had been driving around the west side of Montgomery in the vehicle. However, he stated that he separated from the codefendants before the murder. The officers videotaped and prepared a transcript of this statement.
After they videotaped his statement, the appellant asked if he could change his statement and admitted that he had not told the officers the truth. He then admitted that he had been with the three codefendants and that he had had a .380 pistol that evening. However, he said that Barnes was driving. In most other respects, his statement matched those of his three codefendants. When he asked whether the victim was killed with a shotgun, the officers did not respond, and the conversation ended.
The appellant raises several issues on appeal that he did not present to the trial court. The lack of an objection at trial will not bar our review of an issue in a case involving the death penalty. However, it will weigh against any claim of prejudice. Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985). Thus, we have reviewed the record for any error, whether plain or preserved. See Rule 45A, Ala. R.App. P. Rule 45A provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review... whenever such error has or probably has adversely affected the substantial right of the appellant."
"[This] plain-error exception to the contemporaneous-objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 n. 14 (1982)).

I.
The appellant's first argument is that the trial court improperly granted the State's motion in limine, which prevented *930 the defense from presenting evidence that the victim was a drug dealer. He contends that the motive for the murder was retaliation for a bad drug deal, not robbery. Thus, he argues that the ruling effectively prevented him from presenting a defense, from cross-examining witnesses, from testifying, and from presenting mitigation evidence. He further contends that such evidence would have shown the weakness of the State's contention that the murder occurred during a robbery, which made the murder capital, and that the jury could have determined that he was guilty only of intentional murder, a noncapital offense.
The State filed a pretrial motion in limine asking the trial court to prevent the defense from introducing evidence that the victim had been a drug dealer, contending that such evidence would be irrelevant and immaterial. In response, the defense argued that such evidence was relevant to the motive for the confrontation and would be relevant in sentencing. The trial court conducted a hearing on the motion. At that time, defense counsel argued that he wanted to cross-examine witnesses about whether they knew the victim was a drug dealer. He also stated that the defense theory was that a bad drug deal, and not robbery, was the motive for the murder. The trial court granted the State's motion.
On the day the trial began, the following occurred:
"[Defense counsel]: Judge, we would ask the Court to reconsider the ruling on the motion in limine and at least withhold ruling until maybe the sentencing phase. Our clientÔÇöwe have not made a decision as to whether we are going to allow our client to testify or not. His testimony, if he does testify, will be diametrically opposed to the factsÔÇöunderlying facts as the district attorney has presented them, which creates a conflict and a jury question. His testimony deals with a drug deal. I don't want to be put in a situation where we can't ask our client questions about what really happened in this case. We would be limited, to have his testimony limited.
"The Court: Well, you know, that's the first I have heard of that, for the record. It's not a criticism. It's just for the record. You know, I willÔÇöyou know, if and when you decide whether or not your client is going to testify, I will let you ask me to reconsider it at that point."
(R. 37-38.) The defense did not raise the issue again and did not ask the trial court to reconsider its ruling.
Where a party seeking to introduce evidence suffers an adverse ruling on the opposing party's motion in limine, the adverse ruling alone, unless absolute or unconditional, does not preserve the issue for appellate review. Morton v. State, 651 So.2d 42 (Ala.Cr.App.1994). In this case, because the trial court indicated its willingness to reconsider its ruling on the motion, that ruling was not absolute. Therefore, the appellant "was required to offer the testimony into evidence and obtain a ruling to which, if adverse, [he] could make an offer of proof and thereby preserve the issue for appeal. [He] did not do so and thus, has not preserved any error for review." Perry v. Brakefield, 534 So.2d 602, 607 (Ala.1988). Accordingly, we must review the appellant's claim under the plain error rule. Rule 45A, Ala. R.App. P.
We have reviewed the motion in limine, the defense's response, the discussions about the motion, and the remaining evidence in this case. Based on that review, we do not find any plain error in this regard. The allegation that the murder was committed in retaliation for a bad drug deal was not presented until after the State had filed its motion in limine. The *931 appellant did not mention a bad drug deal in his statements to the police and, in fact, he stated that he did not know the victim. Furthermore, Burdette, Barnes, Williams, and Rudolph did not mention anything about a bad drug deal in their statements. Instead, the appellant made this allegation only after the State had filed its motion in limine. Furthermore, the appellant only speculated that some of the witnesses might have known that the victim was a drug dealer and that they might testify that the victim was killed because of a bad drug deal. Likewise, he did not make an offer of proof as to what the appellant's testimony in this regard would be. Finally, the trial court would have reconsidered its ruling before the trial began if the appellant had informed it that he intended to testify. If the court had changed its ruling, the appellant could have cross-examined witnesses and testified about the alleged bad drug deal. However, the appellant did not inform the trial court that he intended to testify and, in fact, did not raise the issue concerning the motion in limine again. For these reasons, we reject the appellant's claims.

II.
The appellant's second argument is that the trial court improperly admitted into evidence his statement about the murder and improperly refused to conduct a suppression hearing outside the presence of the jury. Before trial, he filed a motion to suppress his statement and requested that the trial court conduct a hearing on his motion. The trial court denied the motion without conducting a hearing. At trial, the State introduced a videotape of, and a written copy of, the appellant's statement into evidence.

A.
The appellant alleges that he did not voluntarily make the statement. First, he contends that, because of his age and lack of experience with law enforcement officers and because he voluntarily went to the police station, he was "particularly vulnerable to police tactics of deception." (Appellant's brief at p. 14.) In his motion to suppress his statement, the appellant contended that the circumstances surrounding the interrogation were coercive, but he did not allege any specific facts to support his contention. Because he did not present the specific claim he now raises to the trial court, we will review it under the plain error rule. Rule 45A, Ala. R.App. P.
Second, the appellant contends, as he did in his motion to suppress his statement, that Detective Signore tricked him into giving the statement by lying to him about having found his fingerprints on a Dairy Queen cup recovered from Flowers' vehicle. In support of his motion to suppress, the appellant recited a portion of Detective Signore's preliminary hearing testimony. At the preliminary hearing and at trial, Detective Signore admitted that, even though officers had recovered a Dairy Queen cup from Flowers' vehicle, he did not know whether the appellant's fingerprints were on the cup. He testified that he knew from the three codefendants that the appellant had been with them and had purchased a soft drink from Dairy Queen on the night of the murder. However, in his initial statement to Signore, the appellant had denied being with any of the codefendants on the day of the murder and had denied being in Flowers' vehicle. Signore testified that he made the statement about the cup and the fingerprints because of those denials and to encourage the appellant to be truthful with him. After Detective Signore made the representations about the cup, the appellant admitted that he had been in the car and had *932 had the Dairy Queen cup, but he stated that he separated from the codefendants early in the evening and denied being involved in the murder. Even though he made several statements about his conduct on the day of the murder, the appellant never admitted that he killed the victim.
Confessions and inculpatory statements are presumed to be involuntary and inadmissible. Ex parte Callahan, 471 So.2d 463 (Ala.), cert. denied, 474 U.S. 1019, 106 S.Ct. 567, 88 L.Ed.2d 552 (1985). For a confession to be properly admitted into evidence, the State must prove that "`the defendant was informed of his Miranda rights and that the confession was voluntarily given.'" Johnson v. State, 680 So.2d 1005, 1007 (Ala.Cr.App.1996) (quoting Mann v. State, 581 So.2d 22, 23 (Ala. Cr.App.1991)).
"`In determining whether a confession is voluntary, the trial court's finding of voluntariness need only be supported by a preponderance of the evidence. Seawright v. State, 479 So.2d 1362 (Ala. Crim.App.1985). The trial court's decision will not be disturbed on appeal unless it is manifestly contrary to the great weight of the evidence.'"
Howard v. State, 678 So.2d 302, 306 (Ala. Cr.App.1996) (quoting Dixon v. State, 588 So.2d 903, 907 (Ala.1991), cert. denied, 502 U.S. 1044, 112 S.Ct. 904, 116 L.Ed.2d 805 (1992)).
"`"In reviewing the correctness of the trial court's ruling on a motion to suppress, this Court makes all the reasonable inferences and credibility choices supportive of the decision of the trial court."' Kennedy v. State, 640 So.2d 22, 26 (Ala.Cr.App.1993), quoting Bradley v. State, 494 So.2d 750, 761 (Ala.Cr. App.1985), aff'd, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987). A trial court's ruling on a motion to suppress will not be disturbed unless it is `palpably contrary to the great weight of the evidence.' Parker v. State, 587 So.2d 1072, 1088 (Ala.Cr.App.1991)."
Rutledge v. State, 680 So.2d 997, 1002 (Ala. Cr.App.1996).
"The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the `totality of the circumstances.' Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant's will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App. 1990) (stating that, to admit a confession, a court must determine that the defendant's will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is `whether the defendant's will was overborne at the time he confessed') (emphasis added)....
". . . .
"[T]he test of involuntariness of a confession, or other inculpatory statement, is not whether the defendant bargained with the police, but whether in his discussions with the police, which may have included bargaining, the defendant's will was overborne by `apprehension of harm *933 or hope of favor.' See Gaddy, 698 So.2d at 1154 (quoting Ex parte Weeks, 531 So.2d 643, 644 (Ala.1988)); Culombe, 367 U.S. at 602, 81 S.Ct. at 1879[, 6 L.Ed.2d 1037]; Jackson, 562 So.2d at 1380. To determine if a defendant's will has been overborne, we must assess `the conduct of the law enforcement officials in creating pressure and the suspect's capacity to resist that pressure'; `[t]he defendant's personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant's] susceptibility to police pressures.' Jackson, 562 So.2d at 1380-81 (citations omitted)."
McLeod v. State, 718 So.2d 727, 729-30 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). Finally, with regard to misrepresentations by police officers during an interrogation, we have held:
"Alabama follows the general rule that a confession is not inadmissible merely because it was induced by a trick or misrepresentation that was not reasonably calculated to lead the accused to confess falsely. Fincher v. State, 211 Ala. 388, 100 So. 657 (1924); Bates v. State, 549 So.2d 601 (Ala.Cr.App.1989); Barrow v. State, 494 So.2d 834 (Ala.Cr.App.1986); 2 C. Gamble, McElroy's Alabama Evidence  200.07(7) (5th ed.1996)."
Campbell v. State, 718 So.2d 123, 136 (Ala. Cr.App.1997), cert. denied, 525 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998). See also Gilder v. State, 542 So.2d 1306 (Ala. Cr.App.1988).
"`[M]ore subtle forms of psychological manipulation, such as trickery or deception by the police, have not been considered sufficiently coercive, standing alone, to render a confession or incriminating statement involuntary. Instead, the trial judge must examine the totality of the circumstances surrounding the statement to determine its voluntariness. Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).'"
Barbour v. State, 673 So.2d 461, 467 (Ala. Cr.App.1994), aff'd, 673 So.2d 473 (Ala. 1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996) (quoting Ex parte Hill, 557 So.2d 838, 841 (Ala. 1989)).
Detective Signore testified about the circumstances surrounding the appellant's confession, including the fact that the appellant initiated contact with the police about the murder investigation. He testified that the appellant voluntarily went to the police station at 2:05 p.m. on April 29, 1997. At 2:16 p.m., he and Detective C.D. Phillips advised the appellant of his Miranda rights, and the appellant signed a waiver of rights form. Thereafter, the appellant made several statements about his whereabouts on the day of the murder. His statement that was admitted at trial began at 3:55 p.m. Detective Phillips was present during the entire time Signore spoke with the appellant. Signore testified that neither he nor Phillips threatened the appellant or promised him anything to convince him to give a statement.
Based on the totality of the circumstances, we conclude that the appellant's will was not overborne by the conduct of law enforcement officials. First, the appellant initiated the contact with the police officers about the murder investigation. Second, the officers did not subject him to a lengthy interrogation. Third, Signore's representations about the fingerprints on the cup, standing alone, were not reasonably calculated to lead the appellant to confess falsely. Rather, after the appellant denied being connected to Flowers' vehicle or to the murder, Signore simply attempted to inform the appellant that he had already been connected to the vehicle *934 used in the commission of the murder so the appellant would be truthful in making his statement. Fourth, the appellant's contention that he was especially susceptible to police tactics of deception is belied by the presentence investigation report, which shows that he had previously been arrested on numerous other charges. Fifth, there is no evidence that the officers threatened or coerced the appellant or that they promised him anything in exchange for his statement. And, sixth, we have reviewed the videotape of the statement, and it does not indicate that the appellant was coerced into giving the statement. Barbour, supra. Thus, we conclude that Signore's misrepresentation was not sufficient to render the appellant's statement involuntary. Therefore, the trial court properly denied the appellant's motion to suppress his statement.

B.
Second, the appellant contends that the trial court erred in admitting his statement without first conducting a suppression hearing outside the presence of the jury. Although he requested a hearing in his written motion, he did not subsequently object when the trial court denied the motion without conducting a hearing. Because the appellant did not present this argument to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
In his written motion to suppress his statement, the appellant argued only that Detective Signore had made a misrepresentation to him about finding his fingerprints on the Dairy Queen cup recovered from Flowers' vehicle. He did not allege any other facts in support of his contention that he did not voluntarily make the statement. Thus, the only question before the trial court was the legal question of whether Signore's misrepresentation rendered the statement involuntary. As set forth above, we have reviewed the evidence presented in the motion to suppress and at trial concerning the circumstances under which the appellant made the statement, and we have concluded that he made it voluntarily. Ex parte Price, 725 So.2d 1063 (Ala.1998); Henry v. State, 468 So.2d 896 (Ala.Cr.App.1984), cert. denied, 468 So.2d 902 (Ala.1985). Under the particular facts of this case, including our finding that the appellant made his statement voluntarily, we find that error, if any, in the trial court's decision to deny the motion to suppress without conducting a hearing did not rise to the level of plain error and was, at most, harmless error. Rule 45, Ala. R.App. P.; Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

III.
The appellant's third argument is that the trial court improperly considered his juvenile record in overriding the jury's recommendation of a sentence of imprisonment for life without the possibility of parole and in sentencing him to death. Specifically, he contends that, in stating that it was relying on his juvenile record to rebut the statutory mitigating circumstance of his age at the time of the offense, the trial court essentially circumvented the law and used his juvenile record as a nonstatutory aggravating circumstance to override the jury's recommendation. This court addressed an almost identical claim in Burgess v. State, 811 So.2d 557 (Ala.Cr.App. 1998), holding as follows:
"Burgess specifically argues that the trial court erred by considering his history of juvenile adjudications to negate the statutory mitigating circumstance of Burgess's lack of a significant criminal history and Burgess's age at the time the offense was committed. In doing so, Burgess says, the trial court `deploy[ed] *935 the prior delinquencies as if they were nonstatutory aggravation to effectively tip the balance in favor of death.' (Appellant's brief, p. 18.)
"Because juvenile adjudications are not convictions under Alabama law, they cannot be considered as prior criminal activity under Alabama's capital sentencing scheme. Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998); Freeman v. State, 555 So.2d 196, 212 (Ala.Cr.App.), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). See Baldwin v. State, 456 So.2d 117, 125 (Ala.Cr.App. 1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). Thus, juvenile adjudications cannot negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity. Freeman, 555 So.2d at 212. Only convictions can negate that statutory mitigating circumstance. Id.

"We disagree with Burgess's characterization of the trial court's consideration of his juvenile adjudications. First, the trial court did not find Burgess's juvenile adjudications to be an aggravating circumstance. The record reflects that the trial court found only one aggravating circumstance: that the murder was committed during the course of a robbery in the first degree. Moreover, the trial court did not, as Burgess maintains, use Burgess's juvenile adjudications to negate the statutory mitigating circumstances that Burgess lacked a significant criminal history and that Burgess was only 16 years old at the time of the offense. Instead, it is clear from the trial court's sentencing order that the court considered Burgess's history of juvenile adjudications in assessing the appropriate weight to assign to these statutory mitigating circumstances.
"Under Alabama's capital punishment statute, the trial court is required to engage in an individualized assessment of the weight to assign to the aggravating and mitigating circumstances found to exist in a particular case in order to determine the propriety of a sentence of death.  13A-5-47(e), Ala.Code 1975; Ex parte Clisby, 456 So.2d 105, 108 (Ala. 1984), cert. denied, 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985). It is clear, moreover, that this weighing process must not be `a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison.'  13A-5-48, Ala.Code 1975. See Ex parte Clisby, 456 So.2d at 108-09 (`The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.'). Although it is well-settled law in Alabama that juvenile adjudications cannot be used to negate the statutory mitigating circumstance that the defendant has no significant history of prior criminal activity, Freeman, supra, 555 So.2d at 212, the courts of this state have never held that the trial court must entirely ignore a defendant's juvenile adjudications in performing its `weighing' duties. The trial court's consideration of a defendant's juvenile adjudications when conducting the weighing process offends neither general constitutional principles nor specific provisions of Alabama law. In fact, Alabama's capital punishment statute contemplates that the trial court will have any prior juvenile record of the defendant before it when it is deciding upon the proper sentence: pursuant to  13A-5-47, Ala. Code 1975, the trial court is required to consider the presentence report of a defendant convicted of capital murder, and *936 Rule 26.3(b)(2), Ala.R.Crim.P., specifically provides for the inclusion of the defendant's prior juvenile record in the presentence report.
". . . .
"Alabama's capital punishment statute does not specify the matters the trial court may consider when engaging in the process of weighing the aggravating circumstances and the mitigating circumstances in a particular case. Nor does the statute require the trial court to make express findings explaining the process by which it weighed the aggravating circumstances and the mitigating circumstances. We conclude that a trial court may, consistent with Alabama law, deem a defendant's juvenile adjudications to be a relevant consideration in its assessment of the weight to assign to the statutory mitigating circumstances of a defendant's lack of a significant criminal history and a defendant's age at the time of the offense."
Burgess, 811 So.2d at 605-06 (footnotes omitted).
In this case, a review of the trial court's sentencing order shows that the court found that only two statutory aggravating circumstances existed: (1) the capital offense was committed by a person under sentence of imprisonment, and (2) the capital offense was committed while the defendant was engaged in a robbery or an attempted robbery. Nothing in the sentencing order indicates that the trial court improperly treated the appellant's juvenile record as a nonstatutory aggravating circumstance. Furthermore, the trial court did not use the appellant's juvenile record to negate the statutory mitigating circumstance of the appellant's age at the time of the offense.[2] Instead, the trial court used that record to assess the weight it would assign to that mitigating circumstance. Under the reasoning of Burgess, such an assessment was proper. Therefore, the trial court did not improperly consider the appellant's juvenile record in overriding the jury's sentencing recommendation and in sentencing him to death.

IV.
The appellant's fourth argument is that the trial court made several errors in its sentencing order.

A.
First, the appellant argues that the trial court improperly considered his physical characteristics in considering the statutory mitigating circumstance of his age at the time of the offense. He contends that his height and weight are arbitrary variables that are not relevant to his moral or criminal responsibility, and that the trial court's consideration of those attributes deprived him of an individualized and reliable sentencing determination.
"[T]he decision as to whether a particular mitigating circumstance is sufficiently proven by the evidence and the weight to be accorded to it rests with the trial court. See Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), affirmed, 603 So.2d 412 (Ala.1992).
"`"`Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating *937 circumstance in sentencing is proven and the weight to be given it rests with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla.1979).' Smith v. State, 407 So.2d 894, 901 (Fla.1981)."'
"Harrell v. State, 470 So.2d 1303, 1308 (Ala.Cr.App.1984), affirmed, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). See also McWilliams v. State, [640] So.2d [982] (Ala.Cr.App.1991)."
Giles v. State, 632 So.2d 568, 572 (Ala.Cr. App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994).
We have carefully reviewed the trial court's sentencing order, and we find the appellant's argument to be without merit. In assessing the weight it would assign to the age mitigating circumstance, the trial court considered the appellant's height, weight, age, physical maturity, and juvenile record[3]; the fact that the appellant was the father of a three-month-old child; the fact that the appellant had used marijuana daily since the age of 14; and the fact that the appellant consumed alcohol on a regular basis. The trial court included the appellant's height and weight in the portion of its analysis that concluded that the appellant was a physically mature adult at the time of the offense. However, those physical attributes were only two of several factors the trial court considered in deciding what weight to assign to the appellant's age as a mitigating circumstance. Giles, supra. Accordingly, the trial court did not err in this regard.

B.
Second, the appellant argues that the trial court improperly plagiarized a sentencing order written by a different judge, in another case, in another state. Specifically, he challenges the trial court's entire analysis of the age mitigating circumstance, and again contends that the trial court deprived him of an individualized sentencing determination.
In its sentencing order, the trial court specifically stated, "When considering the weight to be given to Jackson's age as a mitigating factor, this case is quite similar to Shellito v. State, 701 So.2d 837 (Fla. 1997)." (C.R.177.) The court then analyzed the mitigating circumstance in a form similar to that used by the court in Shellito. Although it adapted the Florida court's reasoning, the trial court clearly incorporated the facts and evidence presented in this case in performing its analysis. Thus, the trial court made an individualized sentencing determination, and the appellant's argument is without merit.

C.
Third, the appellant argues that the trial court improperly negated the role of the jury in sentencing. Specifically, he asserts that the trial court relied too heavily on information the jury did not hear and improperly suggested that the jury's recommended sentence was based on residual doubt. We disagree.
At the outset, we note that, as set forth in Part XVIII of this opinion, in Alabama, the trial court is the sentencing authority. Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990); Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala. 1984). However, before overriding a *938 jury's sentencing recommendation, the trial court must determine that the aggravating circumstances outweigh the mitigating circumstances. The trial court made that determination in this case. Furthermore, in sentencing the appellant to death, the trial court carefully explained why it overrode the jury's recommendation that he be sentenced to imprisonment for life without the possibility of parole. By necessity, a trial court, in sentencing, may rely on information the jury did not hear. As the trial court noted in this case, the court has the benefit of the presentence investigation, any additional evidence presented at the sentencing hearing before the court, and its knowledge of legal precedent, particularly as it applies to the weighing of aggravating and mitigating circumstances. Thus, the appellant's argument that the trial court relied too heavily on information the jury did not hear is without merit.
Further, the trial court did not improperly suggest that the jury made its recommendation based on residual doubt. In its order, the trial court attempted to determine what weight to give the jury's sentencing recommendation. In doing so, the court sought to compare this case to similar cases and to test the reliability of the jury's advisory verdict. When trying to test the reliability of the advisory verdict, the court speculated that the jury may have made its recommendation based on a belief that another of the codefendants fired the fatal shot. However, the trial court ultimately concluded that assigning weight to the advisory verdict based on testing the reliability of the advisory verdict was not appropriate. Thus, the trial court did not base its sentencing determination on speculation about jurors' residual doubt. Rather, the trial court carefully considered the jury's recommendation in overriding that recommendation and sentencing the appellant to death. Therefore, this contention is without merit.

D.
Fourth, the appellant argues that the trial court did not make an adequate determination of his culpability for the offense. However, a review of the sentencing order reveals that this contention is meritless. The trial court clearly states that the evidence showed that the appellant shot the victim. It also states that the appellant was the ringleader in the offense. Therefore, we reject this claim.

V.
The appellant's fifth argument is that the trial court should have instructed the jury on the lesser included offense of robbery. However, he did not request an instruction on robbery, and he did not object when the trial court did not give one. Therefore, we review this contention for plain error. Rule 45A, Ala. R.App. P.
Section 13A-1-9(b), Ala.Code 1975, provides: "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." (Emphasis added.) In Boyd v. State, 699 So.2d 967 (Ala.Cr.App.1997), we held:
"`A defendant accused of a greater offense is entitled to have the trial court charge on any lesser included offense if there is any reasonable theory from the evidence to support the lesser charge, regardless of whether the state or the defendant offers the evidence. Ex parte Pruitt, 457 So.2d 456 (Ala.1984); Parker v. State, 581 So.2d 1211 (Ala.Cr.App.1990), cert. denied, 581 So.2d 1216 (Ala.1991). A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring *939 the offense within the definition of the lesser offense ... Anderson v. State, 507 So.2d 580 (Ala.Cr.App.1987).... Section 13A-1-9(b) provides, "The court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense."'
"Breckenridge v. State, 628 So.2d 1012, 1016 (Ala.Cr.App.1993)."
699 So.2d at 972.
The evidence presented at trial showed that the robbery occurred after the murder. The appellant contends that the trial court should have instructed the jury on the lesser included offense of robbery because the robbery allegedly was a mere afterthought to the murder and it was not committed during the robbery. In fact, he contended at trial that he did not have anything to do with the robbery and that Barnes and Williams stole the car only because he drove away from the crime scene without them. He now contends that, if the jury had believed his theory, it could have found him guilty of the separate offenses of intentional murder and robbery. We disagree.
The trial court instructed the jury on the lesser included offense of intentional murder, thus giving the jury the option of finding that the appellant committed the murder but not the robbery. However, under the evidence presented, the appellant did not actually rob the victim, although there was sufficient evidence to show that that was his intent in initiating the confrontation. Under the appellant's theory that the robbery was a mere afterthought and that it did not occur during the murder, the jury could have found the appellant guilty of murder, but he would not have been guilty of the robbery. Thus, if the jury had believed the appellant's theory and determined that the robbery did not occur during the murder, there would not have been a rational basis for it to find that the appellant was guilty of robbery.
The appellant also contends that the jury could have believed that the robbery did not occur during the murder but still could have found him guilty of being an accomplice to the robbery. This contention is not supported by the record. As stated above, the evidence clearly showed that the appellant's intent when he started following the victim was to rob the victim. If the jury determined that the appellant was guilty of the robbery, even if it determined that he did not kill the victim, then it could only have convicted him of capital murder. Under the evidence presented, he was at least an accomplice to the murder and, more likely, the actual murderer. There was simply no rational basis under the evidence presented on which the jury could find the appellant guilty of robbery and not guilty of murder. Therefore, we do not find any plain error in this regard.

VI.
The appellant's sixth argument is that the trial court improperly denied his request for a continuance to allow him time to secure the attendance of an allegedly critical witness. Before the trial began, the appellant requested a continuance to locate Gerard Burdette, who had been riding in the victim's vehicle at the time of the murder. Shortly after the murder, Burdette had made a statement about the crime to the police. Based on that statement, the appellant contended that Burdette's testimony could exonerate him.[4] *940 The prosecution conceded that Burdette's testimony was material, but it agreed to stipulate that Burdette's written statement could be admitted into evidence. The trial court denied the appellant's request for a continuance, and Burdette's statement was read and admitted into evidence during the appellant's case-in-chief.
"A motion for a continuance is addressed to the discretion of the court and the court's ruling on it will not be disturbed unless there is an abuse of discretion. If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exercised due diligence to secure the evidence."
Ex parte Saranthus, 501 So.2d 1256, 1257 (Ala.1986) (citations omitted). At the hearing on the motion, both the prosecutor and defense counsel stated that they had attempted to locate Burdette and that their efforts had not been successful. They also noted that both state and federal authorities had outstanding warrants for Burdette's arrest, that Burdette's mother stated that she did not know where he was, and that there had been some indication that Burdette was no longer in the Montgomery area. In its written order denying the appellant's motion, the trial court stated:
"In an attempt to accommodate all parties to secure the appearance of Burdette, on February 20, 1998, investigators of the District Attorney's office and a Deputy District Attorney went to the home of Burdette's mother to inquire of his whereabouts. According to the report received from these investigators and the Deputy District Attorney, the mother informed them that she had not seen her son in a year and it was reported that he was not in Montgomery. Because there does not appear to be any reasonable likelihood that Burdette's appearance could be secured in the reasonable foreseeable future, the motion for continuance is denied.
"The Court notes that the State stipulates that the statement of Burdette which was taken by Corporal Cunningham can be used as evidence in the Defendant's behalf."
(C.R.100.) At the close of the State's case-in-chief, when the appellant moved for a judgment of acquittal on the ground that Burdette was not available as a witness, the trial court reiterated:
"As for Mr. Burdette, I have issued an order from competent counsel on why I did not postpone the trial of this case because Mr. Burdette could not be found. But just for the record again, based on everything that has been reported to the Court, Mr. Burdette has charges pending against him, Class A felony charges, I believe, for robbery in the first degree and he has apparently flown the jurisdiction of this Court. And there is no way anybody could tell when Mr. Burdette would ever be [available.] So that is the basis of that. Not anything that counsel did or didn't do. But he is just gone, and nobody knows when he is going to be apprehended and brought back."
(R. 30-31.)
"While we assume for present purposes that the first and third parts of *941 the Saranthus test were met here, we conclude that the trial court did not abuse its discretion in denying the continuance based upon Reese's failure to satisfy the second Saranthus requirement. There was absolutely no showing that, if a continuance were granted, either Ms. Taylor or Mr. Smith could be located. In fact, all indications pointed to the contrary. Since even the State's efforts to find Mr. Smith had proved futile, and Reese's three-month attempt to locate Ms. Taylor had been fruitless, the trial court could rightly conclude there was no `probability' that these witnesses would be forthcoming if the case were continued. `A motion for a continuance in a criminal case is addressed to the sound discretion of the trial court, the exercise of which will not be disturbed unless clearly abused.' Fletcher v. State, 291 Ala. 67, 68, 277 So.2d 882, 883 (1973); Butler v. State, 285 Ala. 387, 393, 232 So.2d 631, 635 (1970), cert. dismissed, 406 U.S. 939, 92 S.Ct. 1807, 32 L.Ed.2d 140 (1972) (`unless a gross abuse of the court's prerogative is shown')."
Reese v. State, 549 So.2d 148, 151 (Ala.Cr. App.1989), overruled on other grounds, Huntley v. State, 627 So.2d 1013 (Ala. 1992). See also Banks v. State, 647 So.2d 46 (Ala.Cr.App.1994); Miller v. State, 602 So.2d 488 (Ala.Cr.App.1992).
Similarly, the appellant has not satisfied the second prong of the Saranthus test. He did not present any evidence that, even if the trial court granted a continuance, Burdette could be located and would testify. Banks, supra. In fact, both the prosecution and the defense had attempted to secure Burdette's attendance at trial, but neither had been successful. Miller, supra. Moreover, Burdette's statement was admitted into evidence by a stipulation of the prosecution and defense counsel. Therefore, the trial court did not abuse its discretion in denying the appellant's motion for a continuance.

VII.
The appellant's seventh argument is that the trial judge improperly left the courtroom while the jurors viewed his videotaped statement. He also contends that, after the jury viewed the videotape and just before court adjourned for the day, the trial court improperly allowed the court reporter to admonish the jurors to avoid exposure to media coverage of the trial, not to discuss the case, and to be back at 9:30 the next morning. Because the appellant did not present these claims to the trial court, we review them for plain error. Rule 45A, Ala. R.App. P.
During the testimony of Officer Signore, after the State had played part of the appellant's videotaped statement, the trial judge stated:
"Ladies and gentlemen, I want to stop for a second. I have seen that video. I don't need to see it. It's important for you to see it. It's not important for my purposes to see it. I do want a copy of the statement, though. I don't have that. I want to read it again. I have got some other things to do. We are going to continue playing this for y'all. I have got some other matters to take care of. It's important for y'all to judge Mr. Jackson's credibility in this video. Y'all make credibility choices. It's important for y'all to observe how this investigation was conducted. Another thing you're going to have to do in judging the credibility of what's said in it is to judge whether or not it was coerced in any manner. So I have already made an initial ruling about that which allows y'all to see it now. But, for my purposes, it is not for me to sit here any more. The fact that I am going to be *942 doing something else doesn't mean that it is not important to y'all and not very important to this trial."
(R. 524.) The appellant did not object when the judge left the courtroom. After the videotape was played, the court reporter stated:
"I have been asked by Judge Gordon to advise the jury not to read the newspapers, not to watch television and not to discuss the case among yourselves or with anyone else and be back at 9:30 a.m. Thursday morning."
(R. 525.) Again, the appellant did not object when the court reporter admonished the jury. At that point, court was adjourned for the day.
"[T]he rule that it is the duty of the presiding judge to be visibly present during every moment in the trial of the case, so that he can always see and hear all that is being said and done, does not mandate a reversal in every instance of his absence. Although in Thomas v. State, 150 Ala. 31, 43 So. 371 (1907), the defendant made no objection to the judge's absence, the following comments are instructive in the present situation:
"`(W)e are of the opinion that the mere absence of the judge during the progress of the trial, when no objection or point was made at the trial, the absence being only for a few moments... does not require or authorize a reversal of the judgment of conviction. Especially so when it does not appear that the defendant suffered any harm or detriment on account of the judge's temporary absence.' Thomas, 150 Ala. at 48 [43 So. 371] (emphasis added).
"In Melvin v. State, 32 Ala.App. 10, 21 So.2d 277 (1944), it was noted:
"`In 23 C.J.S., Criminal Law, Section 972, p. 300, after asserting that the general rule requires the continued presence of the presiding judge during the entire proceedings of the trial, the text observes further: "Nor, in some jurisdictions, is his absence from the room reversible error, where he remains in a position to observe and hear the proceedings and to pass upon any questions which may arise therein, or where he is at all times within immediate call." (Emphasis ours.)' Melvin, 32 Ala.App. at 16, 21 So.2d 277.
"Finding that the trial judge had only left the bench and not the courtroom, the appellate court stressed the importance of the trial judge remaining visible in the courtroom at all times during the proceedings: `Great care and caution should be observed by the trial judge to avoid even the slightest doubt of his accessibility.' Melvin, 32 Ala.App. at 16, 21 So.2d 277.
"In Ex parte Ellis, 42 Ala.App. 236, 159 So.2d 862 (1964), the court found that an affidavit in support of a motion for new trial which asserted that the trial judge left the bench and the courtroom for a period of 15 or 20 minutes during the course of the trial proceedings did not establish that the trial was `lacking in fundamental fairness.'
"`From aught that appears in such affidavit, the trial judge did not remove himself to a point where he abandoned supervision of petitioner's Circuit Court trial or any part thereof. Said affidavit failed to state that said trial judge did not remain in proximity sufficiently close to hear, see and supervise the entire proceedings.
"`Everything is to be presumed in favor of the regularity of the proceedings of a court of justice.' Ellis, 42 Ala.App. at 239, 159 So.2d 862.
"Here, even though defense counsel had no duty to make objection to any offensive *943 or objectionable argument of the prosecutor in the absence of the presiding judge from the courtroom and could have presented objection in his motion for new trial, Woods v. State, 19 Ala. App. 299, 301, 97 So. 179 (1923), there has been no contention that there was any prejudicial remark made by the prosecutor during the trial judge's absence.
"In his brief, the defendant argues that `it is impossible to know what prejudice he suffered in fact.' However, we cannot find that the defendant was harmed in any degree by the absence of the trial judge where there was no allegation made during the course of the proceedings below that he was prejudiced. From the record it does not appear that `the error complained of has probably injuriously affected substantial rights of the parties.' A.R.A.P. Rule 45. Indeed, as in Ex Parte Ellis, there has not even been a showing that the trial judge `did not remain in proximity sufficiently close to hear, see and supervise the entire proceedings.' Ellis, 42 Ala. App. at 239, 159 So.2d 862. For these reasons, we conclude that under the facts of this particular case the trial judge's absence does not require a reversal of the defendant's conviction."
Harris v. State, 409 So.2d 1006, 1008-09 (Ala.Cr.App.1982) (footnote omitted).
In this case, the trial judge was not absent during the arguments of counsel, examination of witnesses, or the handing down of the verdict. Rather, he was absent during the playing of a portion of a videotape and when court adjourned for the day. Before he left, the judge stated that he had previously viewed the videotape, and he thoroughly instructed the jurors about the importance of the videotape and their role in reviewing it. Finally, court adjourned for the day immediately after the videotape was played, and the court reporter made the same comments to the jurors that the judge had made when court had previously adjourned for the day. This action certainly did not amount to a "complete abdication of judicial control" over the trial by the judge, as the appellant contends. The appellant has not alleged or shown that he was prejudiced by the judge's absence from the courtroom. In fact, he has not alleged that any error occurred during the judge's absence. Thus, under the facts of this case, we do not find that the judge's actions rose to the level of plain error. At most, his actions may have constituted harmless error. Rule 45, Ala. R.App. P.[5]

VIII.
The appellant's eighth argument is that the State improperly obtained his conviction by uncorroborated accomplice testimony. Because they had all been indicted for the same capital offense, the appellant argues that Barnes, Rudolph, and Williams were accomplices to the offense and that, therefore, their testimony should have been corroborated.

A.
The appellant first contends that the State did not present sufficient evidence to corroborate the testimony of his accomplices concerning the robbery element of the capital offense. At the close of the State's case-in-chief, the appellant moved for a judgment of acquittal, specifically arguing that the State had not presented sufficient evidence to corroborate the testimony of his accomplices. In denying *944 the appellant's motion, the trial court stated:
"The Court finds that there is sufficient evidence of corroboration in this case for the matter to go to the jury on not only the defendant's statement, but the physical evidence with regard to the weapon and also the bullet itself was recovered in connection with the defendant's oral statement to Detective Signore that he did have a .380 caliber weapon in his possession. Although there is testimony in this case of a .380 that was found after the car was driven off by the other two codefendantsÔÇöor two of the other codefendants."
(R. 29-30.)
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
 12-21-222, Ala.Code 1975.
"`"Corroboration need only be slight to suffice." Ingle v. State, 400 So.2d 938, 940 (Ala.Cr.App.1981). "While corroborating evidence need not be strong, it `... must be of substantive character, must be inconsistent with the innocence of a defendant and must do more than raise a suspicion of guilt.' McCoy v. State, 397 So.2d 577 (Ala.Crim.App.), cert. denied, 397 So.2d 589 (Ala.1981)." Booker v. State, 477 So.2d 1388, 1390 (Ala.Cr. App.1985). "However, the corroboration need not be sufficiently strong by itself to warrant a conviction." Miles v. State, 476 So.2d 1228, 1234 (Ala.Cr. App.1985). The requisite corroborative evidence is determined by a process of elimination or subtraction. Caldwell v. State, 418 So.2d 168, 170 (Ala.Cr.App.1981). "The means for analyzing the evidence to determine if there is sufficient evidence to corroborate testimony of an accomplice is to set aside the accomplice's testimony and determine whether or not the remaining evidence tends to connect the defendant with the commission of the offense." Leonard v. State, 459 So.2d 970, 971 (Ala.Cr.App.1984). "Whether such corroborative evidence exists is a question of law to be resolved by the trial court, its probative force and sufficiency being questions for the jury." Caldwell v. State, supra, at 170. Circumstantial evidence is sufficient to show corroboration. Jackson v. State, 451 So.2d 435, 437 (Ala.Cr.App.1984). See also McConnell v. State, 429 So.2d 662 (Ala.Cr.App.1983).'
"Hodges v. State, 500 So.2d at 1275-76."
Arthur v. State, 711 So.2d 1031, 1059 (Ala. Cr.App.1996), cert. denied, 711 So.2d 1097 (Ala.1997). "A combination of facts may be sufficient to corroborate the testimony of an accomplice even though each single fact, standing by itself, is insufficient." Wilson v. State, 690 So.2d 449, 456 (Ala.Cr. App.1995), aff'd in part, 690 So.2d 477 (Ala.1997).
"`Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice.' Andrews v. State, 370 So.2d 320, 322 (Ala.Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979). In this case, as in Perry v. State, 853 P.2d 198, 200 (Okla. Crim.[App.]1993), the `[a]ppellant himself corroborated [the accomplice's] testimony when he testified at trial and admitted that he shot the victim in self-defense.' See also Hood v. State, 598 So.2d 1022, 1024 (Ala.Cr.App.1991) (accused's own statement to the police corroborated accomplices).
*945 "In Hood v. State, supra, this Court observed:
"`The appellant ... insists that because the "for hire" element of the capital offense was not independently corroborated, the State did not establish a prima facie case of capital murder. That is not the law in Alabama.
"`As early as 1867, our Supreme Court held that a charge requiring corroboration of "every material part" of an accomplice's testimony "went beyond the requirements of the statutory rule, or any rule recognized by the common law." Montgomery v. State, 40 Ala. 684, 688 (1867). More recently, in Ex parte Bell, 475 So.2d 609, 613 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985), a capital case, the court held that Ala. Code 1975,  12-21-222, "does not require corroborative testimony as to material elements of the crime; it only requires other evidence `tending to connect the defendant with the commission of the offense.'" See also Andrews v. State, 370 So.2d 320 (Ala. Cr.App.), cert. denied, 370 So.2d 323 (Ala.1979), wherein this court observed:
"`"The corroboration of an accomplice must tend to connect the accused with the commission of the crime but need not refer to any statement or fact testified to by the accomplice. `Corroborate means to strengthen, to make stronger; to strengthen, not the proof of any particular fact to which the witness has testified, but to strengthen the probative, criminating force of his testimony.' ... Corroborative evidence need not directly confirm any particular fact nor go to every material fact stated by the accomplice."
"Hood v. State, 598 So.2d at 1024-25."
Gurley v. State, 639 So.2d 557, 561-62 (Ala.Cr.App.1993).
Thus, even assuming the codefendants were accomplices, the State was not required to present corroborative evidence as to each element of the capital offense or as to each fact about which the accomplices testified. Rather, it was simply required to present other evidence that tended to connect the appellant to the commission of the offense. We conclude that the State presented sufficient evidence to corroborate the testimony of the appellant's accomplices. In addition to the appellant's conduct and statements to law enforcement officials, the State also introduced the testimony of two eyewitnesses to the offense; the statement of Gerard Burdette; physical evidence recovered from the crime scene and from the vehicles involved in the offense; the spent .380 MagTech shell casing recovered from the crime scene; the bullet recovered from the victim's heart; expert testimony that the bullet was consistent with having been fired from a .380 pistol; the box of .380 MagTech ammunition recovered from the appellant's bedroom; expert testimony that the bullet was consistent with having been fired from the spent shell casing; testimony that Lottie Flowers' vehicle had been stolen and was later recovered with a broken steering column, a dent on the side, and a broken window; the Dairy Queen cup recovered from Flowers' vehicle; testimony that the victim's vehicle was recovered from Porterfield's farm off of Old Hayneville Road; Porterfield's testimony that three young black men were walking around the victim's vehicle the morning after the murder; and the stereo from the victim's vehicle, which was recovered from Williams' girlfriend's residence. Taken as a whole, this evidence was sufficient to corroborate the testimony of the appellant's *946 accomplices. Therefore, the appellant's claim is without merit.

B.
The appellant further contends that the trial court erred because it did not instruct the jury that accomplice testimony must be corroborated by other evidence. However, he did not request such an instruction, and he did not object when the trial court did not give one. Thus, we review this claim for plain error. Rule 45A, Ala. R.App. P.
We have previously applied a harmless error analysis to such a claim. Arthur, supra.
"`The court should have instructed the jury concerning the need for corroborative evidence of McCants's testimony. However, the failure to do so does not mean that this cause must automatically be reversed. Automatic reversal exists only when the error "necessarily renders a trial fundamentally unfair." Rose v. Clark, 478 U.S. 570, [577], 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986). Alabama has applied the harmless error analysis in a case involving the death penalty to the failure of the court to instruct the jury on the principle of accomplice corroboration. Gurley v. State, 639 So.2d 557 (Ala.Cr.App.1993); Frazier v. State, 562 So.2d 543, 558 (Ala.Cr. App.), rev'd on other grounds, 562 So.2d 560 (Ala.1989).
"`As Judge Bowen stated in Gurley:

"`"[T]he error of failing to instruct the jury on the need for corroborative evidence is harmless when the testimony of an accomplice has in fact been corroborated. Frazier v. State, 562 So.2d 543, 558 (Ala.Cr.App.), reversed on other grounds, 562 So.2d 560 (Ala.1989). Accord People v. Brunner, 797 P.2d 788, 790 (Colo.App. 1990); State v. Brown [187 Conn. 602], 447 A.2d 734, 740 (Conn.1982); Ali v. United States, 581 A.2d 368, 377-78 (D.C.App.1990), cert. denied, 502 U.S. 893, 112 S.Ct. 259 [116 L.Ed.2d 213] (1991); Strong v. State [261 Md. 371], 275 A.2d 491, 495 (Md.1971), vacated on other grounds, 408 U.S. 939 [92 S.Ct. 2872, 33 L.Ed.2d 760] (1972); State v. England, 409 N.W.2d 262, 265 (Minn.App.1987)."'"
Arthur, 711 So.2d at 1059 (quoting Burton v. State, 651 So.2d 641, 653-54 (Ala.Cr. App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)). Similarly, because the State presented sufficient evidence to corroborate the testimony of the appellant's accomplices, we conclude that the fact that the trial court did not instruct the jury on the necessity of corroborating accomplice testimony did not rise to the level of plain error and was, at most, harmless error. See Rule 45, Ala. R.App. P.

IX.
The appellant's ninth argument is the State improperly used its peremptory challenges to discriminate on the basis of race and gender. He contends that he showed that there was a prima facie case of discrimination in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), during his trial, and that the trial court should have required the prosecution to provide race- and gender-neutral reasons for its strikes. For these reasons, he urges this court to remand this case to the trial court "for a hearing to determine whether the State discriminated on the basis of gender and race in its use of peremptory strikes." (Appellant's brief at p. 47.)
*947 After the jury was struck but before it was sworn, the following occurred:
"[Defense counsel]: Judge, at this point we would move under Batson and its progeny for the State to explain race-neutral reasons why it struck Numbers 116, 94, 96, 11, 26, and 165, which were the last set of jurors it struck before turning to Your Honor with the random system. Six of those seven are black. Eight of their total strikes were black.
"The Court: That's not enough to establish a prima facie case.... What's your prima facie case?
"[Defense counsel]: I don't believe they have race-neutral reasons for doing that Judge. I mean, six out of seven in a row.

"The Court: That's not enough."
(R. 156.) Thus, the appellant preserved for appellate review his claim of discrimination based on race. However, he did not present his claim regarding discrimination on the basis of gender to the trial court. Therefore, we review that claim under the plain error rule. Rule 45A, Ala. R.App. P.
At the outset, we note that the record on appeal does not include any documents that show the race or gender of the prospective jurors in this case. Furthermore, it does not include copies of the questionnaires completed by the jurors before voir dire examination.
"[T]he record does not contain the clerk's office jury list of any relevant information about the jurors. `It is the appellant's duty to provide this court with a complete record on appeal.' Knight v. State, 621 So.2d 394 (Ala.Cr. App.1993). See also Holder v. State, 584 So.2d 872 (Ala.Cr.App.1991). We cannot predicate error on a silent record. Hutchins v. State, 568 So.2d 395 (Ala.Cr. App.1990)."
Roberts v. State, 627 So.2d 1114, 1116 (Ala. Cr.App.1993). See also Baker v. State, 683 So.2d 1 (Ala.Cr.App.1995). Thus,
"[t]here is no evidence in the record that the prosecutor used his strikes in a racially discriminatory manner. There is no indication of the racial composition of the jury, though a jury strike list is contained in the record. Neither do we know whether any minorities in fact served on the jury. The record simply does not support an inference of plain error on the alleged Batson violation. Our Supreme Court in Ex parte Watkins, 509 So.2d 1074 (Ala.1987), cert. denied, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), refused to find plain error in a similar situation. It stated:
"`The record as a whole simply does not raise an inference that the state engaged in the practice of purposeful discrimination. Under the plain error rule this Court will "notice any plain error or defect in the proceeding under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial rights of the petitioner."... The defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred (i.e., the state's use of its peremptory challenges to exclude blacks).'
"509 So.2d at 1076-77. See Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.1991), cert. denied, [502] U.S. [886], 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) (stating that there was no evidence in the record to support the contention that the State of Alabama used its peremptory strikes to exclude blacks from the jury). `Under the circumstances of this case, we cannot conclude *948 that a prima facie case of purposeful discrimination has been established.' Pierce, 576 So.2d at 242."
Jenkins v. State, 627 So.2d 1034, 1042 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994). See also Freeman v. State, 555 So.2d 196 (Ala. Cr.App.1988), aff'd, 555 So.2d 215 (Ala. 1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990).
Likewise, the record before us does not raise an inference of discrimination based on either race or gender. Nevertheless, the appellant urges us to remand this case so the prosecution can provide reasons for its use of its peremptory challenges.
"As this Court stated in Ex parte Watkins, 509 So.2d 1074, 1077 (Ala.1987), cert. denied, Watkins v. Alabama, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), `[t]he defendant cannot successfully argue that error is plain in the record when there is no indication in the record that the act upon which error is predicated ever occurred.' In effect, McNair is requesting that we remand this case for a hearing on this issue, on the strength of the circuit clerk's affidavit, so that a record can be created for appellate review. We specifically decline this request, for to do otherwise would unduly enlarge the scope of the plain error review as authorized by our appellate rules. See Watkins, supra, in which we had the opportunity in a death penalty case to remand for an evidentiary hearing on a Batson issue, but refused to do so."
Ex parte McNair, 653 So.2d 353, 360 (Ala. 1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). We, too, decline the appellant's request. Because the record before this court does not raise any inference of discrimination, we do not find any reversible error in this regard.

X.
The appellant's tenth argument is that the trial court's instruction on reasonable doubt violated the principles of Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). The trial court instructed the jury on reasonable doubt as follows:
"I have told you that the State has to prove this case beyond a reasonable doubt from the evidence. So let's talk for a moment about what a reasonable doubt is. Simply put, ladies and gentlemen, a reasonable doubt is a doubt for which you can give a reason. It may arise from all the evidence. It may arise from any part of the evidence. It may arise from lack of evidence in any case after a careful and impartial consideration of all of the case. That is what you have got to look at is look at the evidenceÔÇöall the evidence that is presented to you in this case to determine whether or not the State has proven the defendant guilty beyond a reasonable doubt. You don't find a person guilty of a criminal charge based on conjecture or suspicion or surmise. On the other hand though, you don't find a person not guilty because of some vague or conjectural or fanciful doubt. Now the State's burden is to prove the defendant guilty beyond a reasonable doubt. But the State does not have to prove him guilty beyond all doubt or beyond a shadow of a doubt or to a mathematical certainty. But the State has to satisfy its burden by proving his guilt beyond a reasonable doubt from the evidence in this case.
"I would simply say to you that proof beyond a reasonable doubt is proof of such a convincing character that you will be willing to rely and act upon it without hesitation in the most important of your *949 own affairs. So if you are convinced by the evidence that the defendant has been proven guilty of an offense beyond a reasonable doubt, then you must find him guilty. On the other hand, if you are not convinced by the evidence that he has been proven guilty beyond a reasonable doubt, then you must find him not guilty as you look at the charges in this case."
(R. 83-85). The appellant specifically contends that the instruction improperly lowered the State's burden of proof. He did not present this issue to the trial court. Therefore, we review it for plain error. Rule 45A, Ala. R.App. P.
In Knotts v. State, 686 So.2d 431 (Ala. Cr.App.), opinion after remand, 686 So.2d 484 (Ala.Cr.App.1995), aff'd, 686 So.2d 486 (Ala.1996), cert. denied, 520 U.S. 1199, 117 S.Ct. 1559, 137 L.Ed.2d 706 (1997), we held:
"The Due Process Clause of the Fourteenth Amendment `protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970). In Cage v. Louisiana, the United States Supreme Court found that a jury charge that defined `reasonable doubt' by using the phrases `grave uncertainty,' `actual substantial doubt,' and `moral certainty' could have led a reasonable juror to interpret the instructions to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause. Subsequently, the Court `made it clear that the proper inquiry is not whether the instruction "could have" been applied in an unconstitutional manner, but whether there is a reasonable likelihood that the jury did so apply it.' Victor v. Nebraska, 511 U.S. 1, 6, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (quoting Estelle v. McGuire, 502 U.S. 62, 72-73, and n. 4, 112 S.Ct. 475, 482 and n. 4, 116 L.Ed.2d 385 (1991), emphasis in original). Thus, the constitutional question presented here is whether there is a reasonable likelihood that the jury understood the instructions to allow the conviction based on proof insufficient to meet the Winship reasonable doubt standard. Victor v. Nebraska; Ex parte Kirby, 643 So.2d 587 (Ala.), cert. denied, [513] U.S. [1023], 115 S.Ct. 591, 130 L.Ed.2d 504 (1994); Cox v. State, 660 So.2d 233 (Ala.Cr.App.1994).
"In reviewing the reasonable doubt instruction, we do so in the context of the charge as a whole. Victor v. Nebraska; Baker v. United States, 412 F.2d 1069 (5th Cir.1969), cert. denied, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970); Williams v. State, 538 So.2d 1250 (Ala.Cr.App.1988). So long as the definition of `reasonable doubt' in the charge correctly conveys the concept of reasonable doubt, the charge will not be considered so prejudicial as to mandate reversal. Victor v. Nebraska; Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L.Ed. 150 (1954)."
686 So.2d at 459. "`Use of some but not all of the terminology found offensive in Cage does not automatically constitute reversible error.'" Taylor v. State, 666 So.2d 36, 56 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996) (citations omitted). Finally, we have previously held that the statement that a reasonable doubt is a doubt for which a reason can be given does not violate Cage and does not improperly lessen the State's burden of proof. Burgess v. State, 827 So.2d 134 (Ala.Cr.App.1998); Ex parte McWilliams, 640 So.2d 1015 (Ala.1993), aff'd, 666 So.2d 90 (Ala.1995), cert. denied, 516 U.S. 1053, 116 S.Ct. 723, 133 L.Ed.2d 675 *950 (1996); McMillian v. State, 594 So.2d 1253, 1283 (Ala.Cr.App.1991).
Taken as a whole, the trial court's instruction in this case properly conveyed the concept of reasonable doubt to the jury, and it did not lessen the State's burden of proof. There is no reasonable likelihood that the jury applied the instruction in a manner that would violate the appellant's constitutional rights. Therefore, we do not find any plain error in this regard.

XI.
The appellant's eleventh argument is that the trial court improperly admitted photographs and videotapes that allegedly served only to inflame and prejudice the jury. Specifically, he contends that the introduction of one picture of the victim after he was killed seriously prejudiced him. With regard to the remaining photographs and videotapes, he makes only generalizations without specifying which ones he finds objectionable. Because the appellant did not object to the admission of the photographs and the videotapes at trial, we must determine whether the admission of these items constituted plain error. Rule 45A, Ala. R.App. P.
When reviewing these photographs and videotapes, we are guided by the following principles:
"`Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence.... Finally photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors.'"
Gaddy v. State, 698 So.2d 1100, 1148 (Ala. Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990)).
"`[P]hotographs depicting the character and location of wounds on a deceased's body are admissible even though they are cumulative and are based on undisputed matters. Magwood [v. State], 494 So.2d [124, 141 (Ala.Cr.App.1985), affirmed, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986) ]. The fact that a photograph is gruesome is not grounds to exclude it as long as the photograph sheds light on issues being tried. Id. Also, a photograph may be gruesome and ghastly, but this is not a reason to exclude it as long as the photograph is relevant to the proceedings, even if it tends to inflame the jury. Id.'
"Ex parte Bankhead, 585 So.2d 112 (Ala. 1991). Accord, Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, [497] U.S. [1032], 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); McElroy's at  207.01(2)."
Parker v. State, 587 So.2d 1072, 1092-93 (Ala.Cr.App.1991), opinion extended after remand, 610 So.2d 1171 (Ala.Cr.App.), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993). Photographs that depict the crime scene are relevant and therefore admissible. Aultman v. State, 621 So.2d 353 (Ala.Cr.App.1992), cert. denied, 510 U.S. 954, 114 S.Ct. 407, 126 L.Ed.2d 354 (1993); Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Finally,

*951 "`"photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." Ex parte Siebert, 555 So.2d 780, 784 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See generally C. Gamble, McElroy's Alabama Evidence,  207.01(2) (4th ed.1991). "The photographs of the victim were properly admitted into evidence. Photographic exhibits are admissible even though they may be cumulative, ... demonstrative of undisputed facts, ... or gruesome...." Williams v. State, 506 So.2d 368, 371 (Ala.Cr.App.1986), cert. denied, 506 So.2d 372 (Ala.1987).'
"DeBruce v. State, 651 So.2d 599, 607 (Ala.Cr.App.1993). See also Ex parte Bankhead, 585 So.2d 112 (Ala.1991). The court did not err in allowing photographs of the victim's body to be received into evidence."
Hutcherson v. State, 677 So.2d 1174, 1200 (Ala.Cr.App.1994), rev'd on other grounds, 677 So.2d 1205 (Ala.1996). See also Giles v. State, 632 So.2d 568 (Ala.Cr.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993).
In this case, the photographs of the victim depict the character and location of his wounds. Nevertheless, these photographs are neither unnecessarily gruesome nor gory. We have also reviewed the remaining photographs and videotapes, and we do not find that they were unduly prejudicial to the appellant. Those photographs and videotapes were relevant and admissible because they depict the crime scene, the vehicles driven by the victim and the appellant, and the evidence recovered during the investigation of the crime. The appellant has not shown that the admission of any of the photographs or videotapes affected or probably affected his substantial rights. Accordingly, the trial court's admission of the photographs and videotapes did not constitute plain error.

XII.
The appellant's twelfth argument is that the trial court improperly granted the State's challenges for cause as to prospective jurors who expressed objections to the imposition of the death penalty. After the voir dire examination, the following occurred:
"The Court: Exceptions for cause?
"[Prosecutor]: Yes, sir. State would challenge juror [L.A.], Juror [A.A.], Juror [V.C.], Juror [M.E.], Juror [V.G.]"
"The Court: Anything in response to that? Before y'all respond, let me tell you what my inclination is. My inclination is to grant those challenges except for [A.A.] Each of those jurors in my judgment said on the record that there are no circumstances under which they could vote to impose the death penalty, except for [A.A.] Well, I take it back. I'm sorry. [A.A.] said she didn't know if she could vote or not.
"[Prosecutor]: That's why I challenged her.
"The Court: I confused [A.A.] for [B.B.] I think their challenges are due to be granted. That's my initial reaction. If y'all have anything you would like to say about it, I will hear you. Anything y'all have in opposition to any of those?
"[Defense counsel]: We don't have any."
(R. 126-27.) Because the appellant did not present his claim about the challenges for *952 cause to the trial court, we review it for plain error. Rule 45A, Ala. R.App. P.
During general voir dire examination, prospective jurors L.A., A.A., V.C., M.E., and V.G. indicated that they had reservations about imposing the death penalty. Further individual examination by the trial court revealed that the prospective jurors either could not vote on the imposition of punishment or would not vote to impose the death penalty under any circumstances. Prospective juror L.A. indicated that he did not personally condone the death penalty and that he could not impose the death penalty under any circumstances. (R. 82.) Prospective juror A.A. expressed ambivalent feelings about the death penalty. (R. 83.) Upon further questioning by the trial court, she indicated that she did not know whether she could follow the law in recommending a sentence of death or even vote in such a case. (R. 84, 86, 89-90.) Prospective juror V.C. indicated that she could not impose the death penalty under any circumstances. (R. 105, 107.) Prospective jurors M.E. and V.G. indicated that, based on their religious beliefs, they could not vote to impose the death penalty under any set of facts or circumstances. (R. 119-22.) Contrary to the appellant's contention in his brief to this court, not one of these prospective jurors indicated that he or she could follow the law despite his or her opinions about the death penalty.
Initially, we note that the State may successfully challenge for cause any prospective juror who would refuse to impose the death penalty under any circumstances.
"On the trial for any offense which may be punished capitally ..., it is a good cause of challenge by the state that the person would refuse to impose the death penalty regardless of the evidence produced...."
 12-16-152, Ala.Code 1975.
"In Taylor v. State, 666 So.2d 36, 47 (Ala.Cr.App.1994), this Court outlined the guidelines for determining whether a potential juror should be excluded for cause based on his or her feelings concerning capital punishment:
"`"The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is `whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648 [at 657-58], 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). `The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment.' Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). A juror's bias need not be proved with `unmistakable clarity' because `juror bias cannot be reduced to question and answer sessions which obtain results in the manner of a catechism.' Id.

"`"A trial judge's finding on whether or not a particular juror is biased `is based upon determination of demeanor and credibility that are peculiarly within a trial judge's province.' Witt, 469 U.S. at 428, 105 S.Ct. at 854[, 83 L.Ed.2d 841]. That finding must be accorded proper deference on appeal. Id. `A trial court's rulings on challenges for cause based on bias *953 [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion.' Nobis v. State, 401 So.2d 191, 198 (Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala. 1981)."
"`Martin v. State, 548 So.2d 488, 490-91 (Ala.Cr.App.1988), affirmed, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989). "[A] blanket declaration of support of or opposition to the death penalty is not necessary for a trial judge to disqualify a juror." Ex parte Whisenhant, 555 So.2d 235, 241 (Ala.1989), cert. denied, 496 U.S. 943, 110 S.Ct. 3230, 110 L.Ed.2d 676 (1990).'
"Based on the record before us, including the juror's unequivocal response that she would not be able to impose the death penalty in any case, we conclude that the trial court did not err in granting the State's challenge for cause."
Dallas v. State, 711 So.2d 1101, 1107 (Ala. Cr.App.1997), aff'd, 711 So.2d 1114 (Ala.), cert. denied, 525 U.S. 860, 119 S.Ct. 145, 142 L.Ed.2d 118 (1998).
In this case, the prospective jurors indicated either that they could not vote on the imposition of punishment or that they would not vote to impose the death penalty regardless of the evidence produced. Therefore, the trial court's granting of the State's challenges for cause did not constitute an abuse of the court's discretion and did not rise to the level of plain error.
The appellant also contends that the exclusion of these prospective jurors violated his right to be tried by a jury comprised of a fair cross-section of the community. Again, he did not present this claim to the trial court. Therefore, we review it under the plain error rule. Rule 45A, Ala. R.App. P.
"In Johnson v. State, 502 So.2d 877 (Ala.Cr.App.1987), this court faced a similar fact situation. The appellant in Johnson argued that excluding veniremembers who expressed opposition to the death penalty denied him the right to a jury comprised of a fair cross-section of the community. The Johnson court relied on Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), in which the United States Supreme Court stated:
"`"The essence of a `fair cross-section' claim is the systematic exclusion of `a "distinctive" group in the community.' Duren [v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979) ]. In our view, groups defined solely in terms of shared attitudes that would prevent or substantially impair members of the group from performing one of their duties as jurors, such as the `Witherspoon-excludables' at issue here, are not `distinctive groups' for fair cross-section purposes."
"`Lockhart v. McCree, 476 U.S. at 174, 106 S.Ct. at 1765[, 90 L.Ed.2d 137].'
"Johnson, 502 So.2d at 879."
Clemons v. State, 720 So.2d 961, 973-74 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999). Thus, the appellant's fair cross-section argument is without merit.

XIII.
The appellant's thirteenth argument is that the trial court improperly admitted into evidence a bullet for which the State had allegedly not established a proper chain of custody. Dr. James Lauridson, who performed the autopsy on the victim's body, recovered a bullet from the *954 victim's heart and testified that that wound caused the victim's death. He testified that he placed the bullet in a manila envelope, sealed and initialed the envelope, and gave the envelope to Joe Saloom. Joe Saloom, the State's firearms and toolmarks expert, testified that James Sparrow, a forensic investigator who works for Dr. Lauridson, delivered the bullet to him in a sealed manila envelope. James Sparrow did not testify at trial, and the appellant objected to the admission of the bullet, arguing that the State had not established a chain of custody for it. The trial court overruled the appellant's objection, stating, "I'm going to admit it. It's a weak link, if anything." (R. 500.)
"We have held that the State must establish a chain of custody without breaks in order to lay a sufficient predicate for admission of evidence. Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989). Proof of this unbroken chain of custody is required in order to establish sufficient identification of the item and continuity of possession, so as to assure the authenticity of the item. Id. In order to establish a proper chain, the State must show to a `reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain. McCray v. State, 548 So.2d 573, 576 (Ala.Crim.App.1988)."
Ex parte Holton, 590 So.2d 918, 919-20 (Ala.1991).
"`"The purpose for requiring that the chain of custody be shown is to establish to a reasonable probability that there has been no tampering with the evidence." Ex parte Jones, 592 So.2d 210, 212 (Ala.1991); Harrell v. State, 608 So.2d 434, 437 (Ala.Crim.App. 1992); Smith v. State, 583 So.2d 990 (Ala.Crim.App.1991), cert. denied, 583 So.2d 993 (Ala.1991).... Evidence has been held correctly admitted even when the chain of custody has a weak or missing link. Gordon v. State, 587 So.2d 427, 433 (Ala.Crim.App.1990), rev'd 587 So.2d 434 (Ala.), on remand, 587 So.2d 435 (Ala.Crim.App.), appeal after remand, 591 So.2d at 149 (Ala. Crim.App.1991); Shute v. State, 469 So.2d 670, 674 (Ala.Crim.App.1984).'"
Davis v. State, 718 So.2d 1148, 1161 (Ala. Cr.App.1995), aff'd, 718 So.2d 1166 (Ala. 1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999) (quoting Slaton v. State, 680 So.2d 879, 893 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997)). "While each link in the chain of custody must be identified, it is not necessary that each link testify in order to prove a complete chain of custody. Harrison v. State, 650 So.2d 603 (Ala.Crim.App.1994)." Ex parte v. Slaton, 680 So.2d 909, 918 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). Finally, "evidence that an item has been sealed is adequate circumstantial evidence to establish the handling and safeguarding of the item." Lane v. State, 644 So.2d 1318, 1321 (Ala. Cr.App.1994).
Although James Sparrow did not testify, the State presented sufficient evidence to show that the bullet was in the same condition when it was delivered to Saloom as it was when Dr. Lauridson removed it from the victim's body. The absence of Sparrow's testimony constitutes, at most, a weak link in the chain of custody, which would go to the weight and credibility of the evidence rather than its admissibility. Smith v. State, 677 So.2d 1240 (Ala.Cr. App.1995); Knight v. State, 622 So.2d 426, 430 (Ala.Cr.App.1992).
Moreover, even if there had been a break in the chain of custody for the bullet, Dr. Lauridson identified the bullet *955 that was introduced into evidence as the one he removed from the victim's body during the autopsy.
"Physical evidence connected with or collected in the investigation of a crime shall not be excluded from consideration by a jury or court due to a failure to prove the chain of custody of the evidence. Whenever a witness in a criminal trial identifies a physical piece of evidence connected with or collected in the investigation of a crime, the evidence shall be submitted to the jury or court for whatever weight the jury or court may deem proper. The trial court in its charge to the jury shall explain any break in the chain of custody concerning the physical evidence."
 12-21-13, Ala.Code 1975. Therefore, the trial court properly admitted the bullet into evidence.

XIV.
The appellant's fourteenth argument is that there was not sufficient evidence to support his conviction. Specifically, he contends that the evidence does not establish that the murder occurred during a robbery or that he was involved in a robbery.
Section 13A-5-40(a)(2), Ala. Code 1975, provides that a murder committed "by [a] defendant during a robbery in the first degree or an attempt thereof committed by the defendant" constitutes capital murder.
"(a) A person commits the crime of robbery in the first degree if he violates Section 13A-8-43 and he:
"(1) Is armed with a deadly weapon or dangerous instrument; or
"(2) Causes serious physical injury to another.
"(b) Possession then and there of an article used or fashioned in a manner to lead any person who is present reasonably to believe it to be a deadly weapon or dangerous instrument, or any verbal or other representation by the defendant that he is then and there so armed, is prima facie evidence under subsection (a) of this section that he was so armed."
 13A-8-41, Ala.Code 1975. Section 13A-8-43, Ala.Code 1975, provides:
"(a) A person commits the crime of robbery in the third degree if in the course of committing a theft he:
"(1) Uses force against the person of the owner or any person present with intent to overcome his physical resistance or physical power of resistance; or
"(2) Threatens the imminent use of force against the person of the owner or any person present with intent to compel acquiescence to the taking of or escaping with the property."
Alabama's accomplice liability statute provides:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
"(1) He procures, induces or causes such other person to commit the offense; or
"(2) He aids or abets such other person in committing the offense; or
"(3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally required to make."
 13A-2-23, Ala.Code 1975.
"To sustain a conviction under  13A-5-40(a)(2) for capital robbery-murder, the state must prove beyond a reasonable doubt: (1) a `robbery in the first degree or an attempt thereof,' as defined by  13A-8-41; (2) a `murder,' as defined *956 by  13A-6-2(a)(1); and (3) that the murder was committed `during' the robbery or attempted robbery, i.e., that the murder was committed `in the course of or in connection with the commission of, or in immediate flight from the commission of the robbery or attempted robbery in the first degree,  13A-5-39(2). Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). The capital crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating in the act of intentionally killing the victim; the offense consists of two elements, robbing and intentional killing. Davis v. State, 536 So.2d 110 (Ala.Cr.App.1987); Magwood v. State, 494 So.2d 124 (Ala.Cr.App. 1985), aff'd, Ex parte Magwood, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986). The intentional murder must occur during the course of the robbery in question; however, the taking of the property of the victim need not occur prior to the killing. Clark v. State, 451 So.2d 368 (Ala.Cr.App.), cert. denied, 451 So.2d 368 (Ala.1984). While the violence or intimidation must precede or be concomitant with the taking, it is immaterial that the victim is dead when the theft occurs. Thomas v. State, 460 So.2d 207 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984).
"`As the Alabama Supreme Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), "the fact that the victim was dead at the time the property was taken would not militate [against a finding] of robbery if the intervening time between the murder and the taking formed a continuous chain of events." Clements v. State, 370 So.2d 708, 713 (Ala.Cr.App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979); Clark v. State, 451 So.2d 368, 372 (Ala.Cr.App.1984). To sustain any other position "would be tantamount to granting to would-be robbers a license to kill their victims prior to robbing them in the hope of avoiding prosecution under the capital felony statute." Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984).
"`Although a robbery committed as a "mere afterthought" and unrelated to the murder will not sustain a conviction under  13A-5-40(a)(2) for the capital offense of murder-robbery, see Bufford v. State, supra, O'Pry v. State, supra [642 S.W.2d 748 (Tex.Cr.App. 1981) ], the question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). The jury may infer from the facts and circumstances that the robbery began when the accused attacked the victim and the capital offense was consummated when the defendant took the victim's property and fled. Cobern v. State, 273 Ala. 547, 550, 142 So.2d 869, 871 (1962). The defendant's intent to rob the victim can be inferred where "[t]he intervening time, if any, between the killing and robbery was part of a continuous chain of events." Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), affirmed, 460 So.2d 216 (Ala.1984). See also Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962); Crowe v. State, 435 So.2d 1371 (Ala.Cr.App.1983); Bufford v. State, 382 So.2d 1162 (Ala.Cr.App.), cert. denied, 382 So.2d 1175 (Ala.1980); Clements v. State, 370 So.2d 708 (Ala.Cr. App.1978), affirmed in pertinent part, 370 So.2d 723 (Ala.1979).'
"Connolly, 500 So.2d at 63." *957 Hallford v. State, 548 So.2d 526, 534-35 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989).
"It is sometimes said that a robbery committed as a `mere afterthought' and unrelated to the murder will not sustain a conviction for the capital offense of murder-robbery. Connolly v. State, 500 So.2d 57 (Ala.Cr.App.1985), aff'd, 500 So.2d 68 (Ala.1986). However, the appellant's intent to rob the victim may lawfully and correctly be inferred where the killing and the robbery were part of a continuous chain of events. Hallford v. State, 548 So.2d 526 (Ala.Cr.App. 1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)."
Harris v. State, 671 So.2d 125, 126 (Ala.Cr. App.1995). Finally,
"`[i]n determining the sufficiency of the evidence to sustain the conviction, this Court must accept as true the evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider the evidence in the light most favorable to the prosecution.' Faircloth v. State, 471 So.2d 485, 489 (Ala.Cr.App.1984), affirmed, Ex parte Faircloth, [471] So.2d 493 (Ala.1985).
". . . .
"`"The role of appellate courts is not to say what the facts are. Our role, ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision to the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978). An appellate court may interfere with the jury's verdict only where it reaches "a clear conclusion that the finding and judgment are wrong." Kelly v. State, 273 Ala. 240, 244, 139 So.2d 326 (1962). "The rule is clearly established in this State that a verdict of conviction should not be set aside on the ground of the insufficiency of the evidence to sustain the verdict, unless, after allowing all reasonable presumptions of its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince the court that it was wrong and unjust." Bridges v. State, 284 Ala. 412, 420, 225 So.2d 821 (1969).... A verdict on conflicting evidence is conclusive on appeal. Roberson v. State, 162 Ala. 30, 50 So. 345 (1909). "[W]here there is ample evidence offered by the state to support a verdict, it should not be overturned even though the evidence offered by the defendant is in sharp conflict therewith and presents a substantial defense." Fuller v. State, 269 Ala. 312, 333, 113 So.2d 153 (1959), cert. denied, Fuller v. Alabama, 361 U.S. 936, 80 S.Ct. 380, 4 L.Ed.2d 358 (1960).' Granger, 473 So.2d at 1139."
"`... Circumstantial evidence alone is enough to support a guilty verdict of the most heinous crime, provided the jury believes beyond a reasonable doubt that the accused is guilty.' White v. State, 294 Ala. 265, 272, 314 So.2d 857, cert. denied, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975). `Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused.' Cochran v. State, 500 So.2d 1161, 1177 (Ala.Cr.App.1984), affirmed in pertinent part, reversed in part on other grounds, Ex parte Cochran, 500 So.2d 1179 (Ala. 1985)."
White v. State, 546 So.2d 1014, 1017 (Ala. Cr.App.1989).
After instructing the jury on the elements of robbery-murder, the trial court defined the word "during" as follows:
"The phrase `during,' ladies and gentlemen, means in the course of, the commission *958 of, or in connection with or in immediate flight from the commission of a robbery."
(R. 92.) Thereafter, the trial court also instructed the jury on the principles of accomplice liability, or complicity, stating as follows:
"I want to talk to you about what we call complicity. And the law is this. A person is legally accountable for the behavior of another person which constitutes a criminal offense if, with the intent to promote or assist in the commission of that offense, he aids or abets that other person in committing the offense. The words `aid or abet'... comprehend all assistance rendered by acts, words, encouragement, support, or presence, actual or constructive, to render assistance should it become necessary.
"The State has the burden of proving beyond a reasonable doubt from the evidence that there was, by pre-arrangement or on the spur of the moment, a common enterprise or adventure and that a criminal offense was contemplated before you would be justified in finding that the defendant, Mr. Jackson, aided or abetted.
"A person cannot be an aider or abettor unless his purpose is to aid the commission of the offense charged in the indictment. Mere presence alone is not sufficient in order to make one an aider or abettor.
"When two or more persons enter upon an unlawful purpose with a common intent to aid and encourage each other with anything within their common design, they are each criminally responsible for everything which may consequently and subsequently result from that unlawful purpose, whether specifically contemplated or not."
(R. 97-99.) Applying those instructions to the evidence presented at trial, as set forth in this opinion and in the trial court's sentencing order, there was sufficient evidence to show that the murder occurred during a robbery. Therefore, the evidence was sufficient to support the appellant's capital murder conviction.

XV.
The appellant's fifteenth argument is that the trial court improperly treated robbery as both an element of the capital offense and as an aggravating circumstance. This practice is commonly referred to as "double counting" or "overlapping." The appellant specifically contends that "the use of robbery both as an elevator in the guilt-phase and as an aggravator in the penalty-phase failed to narrow the class of cases eligible for the death penalty, resulting in the arbitrary imposition of the death penalty." (Appellant's brief at p. 58.) He also contends that this "double counting" punished him twice for the same act, thus violating the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law.
The appellant makes only bare allegations that his Fourth, Sixth, Eighth, and Fourteenth Amendment rights were violated. Therefore, we will address only his Fifth Amendment argument. Section 13A-5-50, Ala.Code 1975, provides, in pertinent part:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
*959 Accordingly, under  13A-5-50, Ala.Code 1975, a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in  13A-5-49, Ala.Code 1975, as an aggravating circumstance. Further, this court has held that the use of an element of capital murder as an aggravating circumstance does not punish a defendant twice for the same offense. Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995).
"`This practice, known as "double counting" or "overlapping," has been upheld. Haney v. State, 603 So.2d 368 (Ala.Cr. App.1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Kuenzel [v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991) ].
"`Section 13A-5-50, Code of Alabama 1975, states, in part, as follows:
"`"The fact that a particular capital offense as defined in section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence."
"`Clearly,  13A-5-50 provides that a jury may consider an element of capital murder as an aggravating circumstance if that element is listed in  13A-5-49. Further, this court has repeatedly held that the use of an element of capital murder in such a way does not, as the appellant argues, punish a defendant twice for the same offense. Kuenzel, supra; see also Ex parte Kennedy, 472 So.2d 1106 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325 (1985).
"`"A capital punishment scheme, under which the same felony may form the basis of an essential element of the crime and an aggravating circumstance for consideration by the jury in recommending a sentence, does not constitute a denial of the guarantee against double jeopardy."
"`Kuenzel, 577 So.2d at 488, quoting Fortenberry v. State, 545 So.2d 129, 142 (Ala.Cr.App.1988), aff'd, 545 So.2d 145 (Ala.1989), cert. denied, 495 U.S. 911, 110 S.Ct. 1937, 109 L.Ed.2d 300 (1990).'
"Burton, 651 So.2d at 657-58."
Hutcherson, 677 So.2d at 1201. Therefore, the appellant's argument is without merit.

XVI.
The appellant's sixteenth argument is that "the Alabama statute limiting court-appointed attorneys' fees to one thousand dollars for out-of-court work for each phase of trial is deplorable and unconstitutional." (Appellant's brief at p. 59.) Section 15-12-21(d), Ala.Code 1975, limits fees for court-appointed attorneys to $1,000 for out-of-court work in a capital trial, based on a $20 hourly rate. He contends that this limitation on compensation violates the separation of powers doctrine, constitutes a taking without just compensation, deprives indigent capital defendants of the effective assistance of counsel, and denies equal protection in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama state law. These claims have previously been addressed and decided adversely to the appellant. Stewart v. State, 730 So.2d 1203 (Ala.Cr.App.1996), aff'd, 730 So.2d 1246 (Ala.1999); Ex parte Smith, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d *960 300 (1997); Boyd v. State, 715 So.2d 825 (Ala.Cr.App.1997), aff'd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998); Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); May v. State, 672 So.2d 1310 (Ala.1995); Barbour v. State, 673 So.2d 461 (Ala.Cr.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996); Johnson v. State, 620 So.2d 679 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993); Smith v. State, 581 So.2d 497 (Ala.Cr.App. 1990), rev'd on other grounds, 581 So.2d 531 (Ala.1991); Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985); Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979).
Moreover, the statute provides that counsel shall be paid for all hours spent in-court and shall be reimbursed for any expenses reasonably incurred as long as the trial court approves those expenses in advance. Therefore, the appellant's contentions are without merit.

XVII.
The appellant's seventeenth argument is that Alabama's method of execution constitutes cruel and unusual punishment. However, both Alabama courts and the United States Supreme Court have repeatedly held that the death penalty is not per se cruel and unusual punishment and that electrocution as a means of capital punishment does not constitute cruel and unusual punishment. Williams v. State, 627 So.2d 985 (Ala.Cr.App.1991), aff'd, 627 So.2d 999 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Boykin v. State, 281 Ala. 659, 207 So.2d 412 (1968), reversed on other grounds, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).
The appellant also argues that Alabama's method of electrocution is unreliable and that it therefore constitutes cruel and unusual punishment. He contends that the State "will utilize faulty equipment, unqualified personnel, and inadequate procedures" in executing him. (Appellant's brief at p. 60.) In support thereof, he asserts that Alabama's electric chair has malfunctioned during two of the last ten executions, and he specifically refers to several executions that he contends were "botched." We addressed a similar argument in McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998), in which we held:
"`The United States Supreme Court addressed the death by electrocution issue in In re Kemmler, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890). In determining what constitutes cruel and unusual punishments, the Court stated: "Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there is something inhuman and barbarous,ÔÇösomething more than the mere extinguishment of life." Id. at 447, 10 S.Ct. at 933. In holding that such a punishment is not cruel or unusual, the Court reasoned "that this act was passed in the effort to devise a more humane method of reaching the result". Id. Accord Spinkellink v. *961 Wainwright, 578 F.2d 582, 616 (5th Cir.1978). Appellant's contention is therefore without merit; death by electrocution does not amount to cruel and unusual punishment per se, but is a constitutional means of imposing a sentence of death.'
"Jackson v. State, 516 So.2d 726, 737 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
"The appellant also contends that trial counsel should have argued that Alabama `utilizes inadequate equipment, unqualified personnel, and inadequate procedures' and that Alabama's electric chair has consistently resulted `in excessive burning and mutilation of condemned prisoners and rendered death by electrocution in Alabama unpredictable and consistently torturous,' as, he asserts, is evidenced by the executions of Horace Dunkins and John Evans (in those executions repeated applications of electrical current were required because of a malfunction in the apparatus) and by the executions of Dunkins, Michael Lindsay, and Wayne Ritter (post-execution examinations revealed burns to portions of the prisoners' bodies).
"`In Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947), the United States Supreme Court, in addressing the issue of whether it was cruel for a state to electrocute a prisoner after the state's first attempted electrocution failed, stated:
"`"The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely. The fact that an unforeseeable accident prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution.... We cannot agree that the hardship imposed upon the petitioner rises to that level of hardship denounced as denial of due process because of cruelty."
"`Id. at 464, 118 S.Ct. 1396, 67 S.Ct. at 376-77.
"`The very issues raised by appellant here were addressed in Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala. 1983), aff'd in part, rev'd in unrelated part, 726 F.2d 1505 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218[, 83 L.Ed.2d 148] (1984), wherein the court adopted the opinion and views expressed by Judge Sam C. Pointer after a hearing on the issues, in Raines v. Smith, No. 83-P-1080-S (N.D.Ala.) (unpublished order entered June 3, 1983) (certified copy attached as Appendix, Ritter v. Smith, 568 F.Supp. at 1525-27). The claims presented to Judge Pointer were as follows: (1) given the nature of the equipment and the procedures used, there was unnecessary and wanton infliction of pain and suffering upon persons subject to electrocution in Alabama; (2) the equipment and method involve an unreliable method of execution; and (3) electrocution involves, in its method and equipment, a mutilation of the body which should be viewed as contrary to and violative of the Eighth Amendment. Id. at 1525-26.
"`After an evidentiary hearing, Judge Pointer held that the claims were due to be dismissed. Id. at 1527. In reaching this decision, Judge Pointer noted that the testimony established that over the past 50 *962 years the chair in question had been used approximately 154 times without any failure; that Evans suffered no pain after the initial shock; and that the possibility that the chair may malfunction at some time in the future does not render its use unconstitutional. Id. at 1526. Judge Pointer relied upon Francis v. Resweber and In re Kemmler [, 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed. 519 (1890),] in holding that Alabama's method of electrocution is constitutional. Id. at 1526-27. We agree.
"`There is no evidence before this court that contradicts the findings made by Judge Pointer. There has been absolutely no showing that the State's method of enforcing a death sentence inflicts any more pain than is absolutely necessary. It has not been established that the equipment used in the electrocution of John Lewis Evans malfunctioned or that Evans felt anything after the first split second of the first jolt of electricity administered.'
"Jackson, 516 So.2d at 738."
706 So.2d at 846-47. Thus, the appellant's arguments about Alabama's method of execution are without merit.

XVIII.
The appellant's eighteenth argument is that the trial court improperly overrode the jury's unanimous recommendation that he be sentenced to imprisonment for life without the possibility of parole. In support thereof, he complains that "Alabama is the only state in the country which allows trial courts to reject jury capital sentencing verdicts without reference to any uniform norm or standard." (Appellant's brief at p. 62.) He further contends that, "[b]ecause the override is standardless in Alabama, there is a haphazard and inconsistent application of the ultimate sanction in a manner that is inconsistent with the precedents of the Supreme Court." (Appellant's brief at p. 65.) We have previously addressed and rejected similar arguments in Carr v. State, 640 So.2d 1064 (Ala.Cr.App.1994), and in Bush v. State, 695 So.2d 70 (Ala.Cr. App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). In Carr, we explained:
"The appellant maintains that the jury override provision of Ala.Code 1975,  13A-5-47(e), is unconstitutional. He claims that the statute contains no guidelines for the sentencing judge to follow and that the statute violates the Eighth Amendment, particularly in a case where, as here, the jury unanimously recommends a sentence of life imprisonment without parole.
"Sentencing by a jury is not constitutionally required. Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). Proffitt v. Florida, 428 U.S. 242, 251-52, 96 S.Ct. 2960, 2966-67, 49 L.Ed.2d 913 (1976), and  13A-5-47(e) set `out a standard of review for jury override that meets constitutional requirements.' McMillian v. State, 594 So.2d 1253, 1272-73 (Ala.Cr.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992). The argument that the jury override provision of  13A-5-47(e) is constitutionally infirm because it allows for the `arbitrary and standardless' imposition of the sentence of death has been repeatedly rejected by the appellate courts of this state. See, e.g., Ex parte Jones, 456 So.2d 380, 381-83 (Ala. 1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); McMillian v. State, 594 So.2d at 1272; Parker v. State, 587 So.2d 1072, 1098 (Ala.Cr.App.1991). See also Ex parte Giles, 632 So.2d 577 (Ala.1993) (holding *963 that Ala. Const.  11 `does not preclude judicial override of the jury's sentencing recommendation in a capital case').
"The trial court's sentencing order reflects the fact that the court gave `consideration to the recommendation of the jury in its advisory verdict that the defendant be sentenced to life without parole.' R. 65. The court, however, after independently weighing the aggravating and mitigating circumstances, determined that the aggravating circumstance outweighed the mitigating circumstances and chose not to accept the jury's recommendation. Constitutional and statutory provisions require no more."
Carr, 640 So.2d at 1073-74.
"The appellant's contention that the override provision of  13A-5-47(e) is facially unconstitutional is without merit. The United States Supreme Court, as well as the courts of this state, have consistently upheld the validity of the judicial override of advisory jury verdicts. See, e.g., Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995); Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Spaziano v. Florida, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984); Ex parte Jones, 456 So.2d 380 (Ala.1984), cert. denied, 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 838 (1985); Freeman v. State, 555 So.2d 196 (Ala.Cr.App.1988), aff'd, 555 So.2d 215 (Ala.1989), cert. denied, 496 U.S. 912, 110 S.Ct. 2604, 110 L.Ed.2d 284 (1990). In this state, the recommendation of the jury is advisory only and is not binding upon the trial court. Ex parte Jones. The trial court, not the jury, is the sentencing authority. Freeman v. State.

"Section 13A-5-47(e) prescribes the following standard of review for jury override, which standard meets constitutional requirements: `The whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation.' Ex parte Jones, 456 So.2d at 382. The appellant's argument that the Alabama Death Penalty Act permits a trial court to impose a death sentence without any standards to guide its discretion is simply not true and ignores the requirements of the override provision.
"The appellant argues that we should follow the Florida standard for jury override prescribed in Tedder v. State, 322 So.2d 908 (Fla.1975). Tedder provides that, in order for a trial court to reject a jury's recommendation of a sentence of life imprisonment without parole, `the facts suggesting a sentence of death [must be] so clear and convincing that virtually no reasonable person could differ.' Id. at 910. The Tedder standard is not constitutionally mandated, Harris v. Alabama; Ex parte Jones, and we have chosen not to read the Tedder standard into our death penalty statute.
"What we do require is that, before sentencing a defendant to death, the trial court consider all the available evidence; hear arguments on aggravating and mitigating circumstances; enter written findings of fact summarizing the crime and the defendant's participation in it; make specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in  13A-5-49, each mitigating circumstance enumerated in  13A-5-51, and any additional mitigating circumstance offered pursuant to  13A-5-52; consider and weigh the advisory verdict of the jury; consider and weigh the presentence investigation report; consider and weigh the mitigating and aggravating circumstances; and determine *964 that the aggravating circumstances outweigh the mitigating circumstances. We believe that this scheme adequately channels the trial court's discretion so as to prevent arbitrary results. The Eighth Amendment does not require the state to define the weight the sentencing judge must accord an advisory verdict. Harris v. Alabama.

"`[T]he sentencing authority in Alabama, the trial judge, has unlimited discretion to consider any perceived mitigating circumstances, and he can assign appropriate weight to particular mitigating circumstances. The United States Constitution does not require that specific weights be assigned to different aggravating and mitigating circumstances. Murry v. State, 455 So.2d 53 (Ala.Cr.App.1983), rev'd on other grounds, 455 So.2d 72 (Ala.1984). Therefore, the trial judge is free to consider each case individually and determine whether a particular aggravating circumstance outweighs the mitigating circumstances or vice versa. Moore v. Balkcom, 716 F.2d 1511 (11th Cir.1983). The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.'
"Clisby v. State, 456 So.2d 99, 102 (Ala. Cr.App.1983). We are convinced, after reviewing the record in this case, that the trial court complied with the sentencing scheme of Alabama's death penalty statute and that the sentence that it imposed, overriding the jury's verdict, met constitutional requirements and was not arbitrary, discriminatory, or fundamentally unfair."
Bush, 695 So.2d at 93-94.
Similarly, for the reasons set forth in this opinion, we conclude that the trial court complied with the sentencing requirements of Alabama's death penalty statute in overriding the jury's verdict and in sentencing the appellant to death. We further note that, in its sentencing order, the trial court specifically explained its reasons for overriding the jury's advisory verdict. Therefore, the trial court did not improperly override the jury's unanimous recommendation that the appellant be sentenced to imprisonment for life without the possibility of parole for the capital conviction.

XIX.
The appellant's nineteenth argument is that he is entitled to a new trial based on the cumulative effect of the above-alleged errors. However, we have reviewed those claims individually and have not found any error. Likewise, we have considered those claims cumulatively, and we still do not find any error that requires a new trial. Thus, this contention is without merit.

XX.
Pursuant to  13A-5-53, Ala.Code 1975, we must address the propriety of the appellant's conviction and sentence of death. The appellant was indicted and convicted of capital murder because he committed the murder during the course of a robbery in the first degree. See  13A-5-40(a)(2), Ala.Code 1975.
The record does not indicate that the sentence of death was imposed as a result of the influence of passion, prejudice, or any other arbitrary factor.  13A-5-53(b)(1), Ala.Code 1975.
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. The trial court found *965 that the State proved two aggravating circumstances: 1) the appellant committed the capital offense while he or an accomplice was engaged in the commission of a robbery,  13A-5-49(4), Ala.Code 1975, and 2) the appellant committed the capital offense while he was under sentence of imprisonment,  13A-5-49(1), Ala.Code 1975. The trial court found that there was one statutory mitigating circumstanceÔÇö the appellant was 18 years old at the time of the offense,  13A-5-51(7), Ala.Code 1975. The trial court also found the following nonstatutory mitigating circumstances: 1) the appellant voluntarily surrendered to the police; 2) the appellant did not attempt to evade his probation officer once he had been declared delinquent; 3) the appellant was truthful to his mother and was no trouble at home; 4) the appellant was not violent toward his girlfriend; 5) the appellant, according to his aunt, is a truthful person; and 6) the appellant exhibited remorse about the crime. The sentencing order shows that the trial court weighed the aggravating and mitigating circumstances and, as set forth in Part IV of this opinion, carefully considered the jury's advisory verdict. We conclude that the trial court's findings are supported by the record and that it correctly sentenced the appellant to death.
Section 13A-5-53(b)(2) requires us to weigh the aggravating and mitigating circumstances independently to determine the propriety of the appellant's sentence of death. After independently weighing the aggravating and mitigating circumstances, we find that the death sentence is appropriate.
As required by  13A-5-53(b)(3), we must determine whether the appellant's sentence was disproportionate or excessive when compared to the penalties imposed in similar cases. The appellant murdered the victim during the course of a robbery in the first degree. Similar crimes are being punished by death throughout this state. Gaddy v. State, 698 So.2d 1100 (Ala.Cr. App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997); Bush v. State, 695 So.2d 70 (Ala.Cr.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997); Payne v. State, 683 So.2d 440 (Ala.Cr.App. 1995), aff'd, 683 So.2d 458 (Ala.1996), cert. denied, 520 U.S. 1146, 117 S.Ct. 1319, 137 L.Ed.2d 481 (1997); Windsor v. State, 683 So.2d 1027 (Ala.Cr.App.1994), aff'd, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). Accordingly, we conclude that the sentence was neither disproportionate nor excessive.
Finally, we have searched the entire record for any error that may have adversely affected the appellant's substantial rights, and we have not found any. Rule 45A, Ala. R.App. P.
Accordingly, we affirm the appellant's convictions and sentences as to both the capital offense and the theft offense.
AFFIRMED.
LONG, P.J., and McMILLAN, COBB, and FRY, JJ., concur.

APPENDIX

Trial Court's Order Dated June 25, 1998

I. SYNOPSIS
Lefrick Moore (Moore) was shot and killed on April 25, 1997, by Shonelle Jackson (Jackson). The motivation for the homicide was the theft of the stereo system from Moore's car. Jackson was convicted of the capital offense, and the jury recommended that he be punished by imprisonment *966 for life without the possibility of parole.

II. PROCEDURAL HISTORY
Jackson[1] was indicted in a four-count indictment for (1) the capital murder of Moore during a robbery in the first degree, Ala.Code  13A-5-40(2); (2) the capital murder of Moore pursuant to  13A-5-40(a)(17); (3) theft of an automobile belonging to Ms. Lottie Flowers; and (4) an alternative count of receiving stolen property in the first degree (Ms. Flowers' automobile). The charge of capital murder pursuant to  13A-5-40(a)(17) was dismissed before trial, and at trial, the State elected to proceed on the charge of theft of property in the first degree and the charge of receiving stolen property was dismissed.
The jury returned verdicts of guilty of capital murder and theft of property in the first degree; and after a separate sentencing hearing, the jury recommended by a vote of 12-0 that Jackson be punished by life imprisonment without the possibility of parole.

III. THE VICTIM
Lefrick Moore was 23 years old, and he was married and the father of one child.

IV. SUMMARY OF THE CRIME AND JACKSON'S PARTICIPATION
The events which led to Moore's homicide started April 24, 1997, and were unrelated to Moore. On that evening, "Cocomo" slapped Jackson at a nightclub. The next day, April 25, Jackson determined to look for Cocomo and the tendencies of the evidence are that Jackson intended to do Cocomo physical injury, should he be found.
Jackson did not have a car. He approached Antonio Barnes about stealing a car for him.[2] Barnes readily agreed, and Barnes and Jackson solicited "Wendel" to drive them to Brookview Apartments, where Jackson and Barnes stole Ms. Flowers' car. Barnes actually broke into the car and Jackson stood lookout.
Jackson, Barnes, Eric Williams, and Christopher Rudolph then commenced the search for Cocomo. Jackson was armed with a .380 caliber semiautomatic pistol; Barnes was armed with a .357 magnum handgun; Rudolph was armed with a 9 millimeter pistol; and Williams was armed with a shotgun. The search for Cocomo was futile; however, near the Smiley Court housing neighborhood, they saw Moore driving his car. Williams told the group that he was familiar with the car and the driver, and that the car had good music. Jackson then announced that "they" were going to rob the people in Moore's car. They stalked Moore until the opportunity presented itself to cut off Moore's car. Jackson passed Moore's car and cut in front of it to stop Moore. The cars collided and Jackson and Williams jumped out as Moore and the passenger in the car, Gerard Burdette, were getting out. At this point, Jackson and Williams fired their weapons. Before firing, however, Jackson said to Moore, "no need to run, motherfucker."[3] Jackson shot Moore, and Moore ran 100 to 150 yards, at which point *967 he collapsed and died. Jackson drove to where Moore lay, and Jackson's purpose was to rifle through Moore's pockets.[4] Barnes and Williams got into Moore's car and left the scene. They hid the car, and Williams took the stereo from the car. The next day, Jackson wanted to strip the car, and he, Barnes and "Fido" went to where the car was hidden; however, a Mr. Porterfield interrupted them and they left without stripping the car. On this same day, Williams told Jackson that Moore was dead, to which Jackson replied, "I don't give a fuck, he didn't stay where we stayed at."
Jackson turned himself in to the Montgomery Police Department after learning that he was wanted for questioning. He gave three conflicting statements to detectives. In the first statement he denied any knowledge of the event. He later said that he was with Deon driving around looking for Cocomo in a stolen car but had no involvement in the murder. In the final statement he admitted that he was at the scene and armed with a .380 pistol; however, he denied shooting Moore.

V. AGGRAVATING CIRCUMSTANCES
The State argues that it proved two aggravating circumstances: (1) that the capital offense was committed while Jackson was engaged in or was an accomplice in the commission of a robbery,  13A-5-49(4); and (2) that the capital offense was committed by a person under sentence of imprisonment,  13A-5-49(1). The Court finds that the State proved both aggravating circumstances beyond a reasonable doubt.
The  13A-5-49(4) sentencing aggravating circumstance is the mirror of  13A-5-40(2) guilt "aggravator," and when the jury found Jackson guilty of the capital offense, the jury found the sentencing aggravator beyond a reasonable doubt. The Court's independent examination of the evidence, as summarized in section [IV.], leads the Court to hold that the jury's verdict in the guilt phase on this aggravator is highly reliable and the Court independently finds that the State proved this circumstance beyond a reasonable doubt.
It is undisputed that when Jackson committed the offense he was on probation on suspended sentences for convictions of burglary in the second degree and theft of property in the first degree (CC-95-2147-EWR) and possession of marijuana in the first degree (CC-95-2367-EWR).

VI. MITIGATING CIRCUMSTANCES
Jackson suggests one statutory mitigating circumstance; he was 18 years old at the time of the offense.  13A-5-51(7). He suggests two nonstatutory mitigating circumstances: (1) that he voluntarily surrendered to the police; and (2) that he did not evade or resist arrest and he did not avoid his probation officer after he was declared a delinquent probationer.

a. Statutory Mitigating Circumstances
The Court finds that Jackson has a significant history or prior criminal activity.[5]
The Court finds that the capital offense was not committed while Jackson was under the influence of extreme mental or emotional disturbance. There is no evidence that Jackson suffered any mental illness or mental instability or that his *968 actions were motivated by anything other than his desire to commit the theft of the stereo from Moore's automobile.
The Court finds that Moore was not a participant in Jackson's conduct and the Court finds that Moore did not consent to Jackson's conduct. No evidence supports this circumstance.
The Court finds that the Defendant was not an accomplice in the capital offense committed by another and the Court finds that his participation was not relatively minor; to the contrary, Jackson was the ringleader in this offense, and there is evidence that he was the shooter.[6]
The court finds that Jackson did not act under extreme duress or under the substantial domination of another person. There is no evidence of any form of duress and, as stated above, Jackson was the ringleader.
The Court finds that there is no evidence which suggests that Jackson lacked the capacity to appreciate the criminality of his conduct, and there is no evidence that he lacked the ability to conform his conduct to the requirements of law.
Jackson was 18 years old at the time of the commission of this offense. The Court finds that his age is a mitigating circumstance, but it is due slight weight for the reasons stated below.
When considering the weight to be given to Jackson's age as a mitigating factor, this case is quite similar to Shellito v. State, 701 So.2d 837 (Fla.1997).
At the time of the homicide, Jackson was 6 feet tall, weighed 175 pounds and was within 35 days of being 19 years old. He is now 20 years old. At the time of the offense he apparently was, and he is, a physically mature adult. The victim was 23 years old.
Jackson's criminal record started at age 12 in juvenile court. He was arrested eight times as a juvenile, and he was adjudicated guilty of four felonies (burglary in the third degree, theft of property in the second degree, robbery in the first degree, and robbery in the first degree), and he was committed to the Department of Youth Services on adjudications for assault in the third degree and two charges of robbery in the first degree. At age 17 he was waived from the juvenile court to adult court for prosecution on charges of burglary in the second degree, theft of property in the first degree, and possession of marijuana in the first degree.
Jackson's combined criminal record shows that he has been arrested 13 times and he has been charged with 14 separate crimesÔÇöfive of which are felonies. Two of the felonies and one misdemeanor (assault in the third degree) are violent crimes. He was on probation for three felonies at the time he committed the homicide. He is the father of a three-month-old child. According to the presentence report, he was a daily user of marijuana since age 14 and a regular consumer of alcohol. He does not consider his marijuana use or his alcohol consumption a problem.
Jackson's age is a marginal mitigating circumstance. Shellito at 843.

b. Nonstatutory Mitigating Circumstances

i. General
The Court finds as a mitigating circumstance that Jackson voluntarily surrendered to the police; however, this mitigating circumstance receives slight weight *969 inasmuch as Jackson denied any responsibility in this matter and attempted to avoid all responsibility.
The Court finds that it is a mitigating circumstance that Jackson did not attempt to evade his probation officer once he had been declared delinquent. But, the Court gives this mitigating circumstance little weight inasmuch as the delinquent charge or charges did not grow out of the incident involving Moore; rather, they grew out of other violations of his probation.
The Court finds as a mitigating circumstance that Jackson was truthful to his mother and was no trouble at home; however, she further testified that he had no violent tendencies and he had only minor scrapes with the law. In view of his juvenile record and his adult criminal record, either Ms. Jackson was mistaken or her testimony was colored by her motherly love and motherly instincts. The record reflects that Jackson in fact has violent tendencies as exhibited by two juvenile adjudications for robbery in the first degree and an adjudication for assault in the third degree, and it can hardly be said that his involvement with the law was minor. Therefore, the Court gives little weight to this mitigating circumstance.
The Court finds as a mitigating circumstance that Jackson was not violent toward his girlfriend, and that, according to his aunt, he is a truthful person. However, in view of his overall criminal history and his apparent untruthful statements to police officers, the Court gives these circumstances slight weight.
The Court has examined the record for other evidence of non-statutory mitigating circumstances. In this regard, the court has examined Jackson's statement in the presentence report. His statement does exhibit remorse; however, it appears to the Court that just as Jackson did in his statements to the police, he is still attempting to avoid responsibility for this offense; and in view of his criminal history the Court has a legitimate basis to doubt and the Court does doubt the bona fides of his expressed remorse.

ii. The Advisory Verdict
Section 13A-5-47(e) requires that the Court consider the advisory verdict in determining Jackson's sentence. Whether the advisory verdict of life imprisonment without the possibility of parole is considered a mitigating circumstance is an unsettled issue. See Lewis v. State, 398 So.2d 432 (Fla.1981)(jury recommendation of life without parole is considered a mitigating circumstance). But Ed Carnes (now Judge Ed Carnes of the Eleventh Federal Judicial Circuit) opined in 1981 that the life recommendation is not a mitigating circumstance. E. Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala. Law. 456, 490 n. 37 (July 1981). The court is not cited to any Alabama case that speaks to this issue.
The death acts of Alabama, Florida, and Indiana allow the sentencerÔÇöthe trial judgeÔÇöto override or not accept the advisory verdict; however, unlike the states of Florida and Indiana, neither the Alabama Death Act nor Alabama case authority informs the trial court how it is to consider the advisory verdict.[7]
When considering the advisory verdict the Court considered two approaches: (1) *970 to compare this case to other similar reported cases; and (2) to test the reliability of the advisory verdict. The Court initially determined that it was more appropriate to compare similar cases because the Court thought that this case could be approximately measured against a standard, and to this end the Court required counsel to inform the Court of the sentences in other similar cases. However, in the final analysis, this method did not prove entirely satisfactory because sentencing is ultimately judge done and what intrinsically drives the sentence is never truly discernable. The State has proffered five cases for the Court's consideration: Lynn v. State, 477 So.2d 1365 (Ala.Crim.App.1984); Hart v. State, 612 So.2d 520 (Ala.Crim.App. 1992); Carr v. State, 640 So.2d 1064 (Ala. Crim.App.1994); DeBruce v. State, 651 So.2d 599 (Ala.Crim.App.1993); Cothren v. State, 705 So.2d 849 (Ala.Crim App. 1997). The Court has read and considered each case, and although none is identical to the case sub judice, each contains some parallels and the Court is satisfied that taken together they offer a sufficient basis to compare against the sentencing verdict delivered by the jury in this case.
The Court has not ignored the response of the defense. The Court does not accept as controlling the oft-repeated statistic that "approximately two-thirds of death penalty cases in Alabama are result of murder during the course of a robbery." Guthrie v. State, 689 So.2d 948, 949 (Ala. Crim.App.1996). The defense makes a point that the appellate courts do not refer to the cases in which the death penalty is not imposed. The defense appears to argue that the analysis is not case-specific, which it suggests is constitutionally required to determine whether there is true proportionality in death sentencing. Whether this is correct as a matter of law is not an issue for this Court to answer.
Having considered the advisory verdict and the cases proffered by the State, the court concludes that a verdict of death in this case would not be disproportionate or excessive when considered against the cases cited above.[8]
The alternative approach to complying with the statutory mandate that the Court "consider" the advisory verdict is for the Court to test the reliability of the advisory verdict. To effectively utilize this approach, the Court should presume that the sentencing verdict was not driven by or partially a product of the guilt-phase verdict.[9] However, as will be pointed out *971 below, the approach is less satisfactory than the comparison approach.
When considering the jury's recommendation, the Court is aware that attempting to explore the objective basis for the verdict may lead it into exploring the subjective basis for the verdict, and this would lead the Court down a slippery judicial slope. Therefore, the Court has consciously attempted to consider only the explanations based on the facts and inferences of fact which could have been reasonably determined by the jury.
Before the analysis is undertaken, it is necessary to set out evidence before the jury that was not produced by testimony, and that is the statement of Gerard Burdette, the passenger in Moore's car. A written transcript of this statement to police was put into evidence and provided to the jury in lieu of his testimony, because Burdette could not be located at the time of trial.
According to Burdette, he was very "tight" with Moore. Transcript, unnumbered p. 9, question 4 and answer. Therefore, the Court presumes his statement would be favorable to Moore. His statement, not surprisingly, varies from the testimony given by Barnes, Williams, and Rudolph.
Burdette's version of the event is "Got out they window and pointed they gun, and told us, say, `Don't move.' ... And at first they shot out the window when they got out the window.... Then we got out and ran, and they just kept shooting." He said there were at least three people in the other car, maybe four; and he saw a black long .38 or maybe .357. "I think it was a.38 though, brown handle." One of the people in Jackson's car (the chubby one) he had seen the day before. Transcript, p. 7.
Burdette did not identify anyone with a.380 automatic, and he did not specifically enumerate how many people fired shots. He said he heard four to five shots (p. 8), and because he said he saw two persons with weapons, it could be reasonably inferred that the one or both fired. This latter point is consistent with the trial testimony. However, according to Burdette, and the medical examiner's opinion of the type bullet that killed Moore, the person with the .38 or .357 would have fired the fatal shot. That person was Barnes, assuming the testimony can be reconciled, because the evidence from Barnes and Williams is that Barnes had a.357.
When the Court takes Burdette's testimony into account, there are several explanations for the advisory verdict. First, the jury could have been swayed by the pleas for mercy that were made by Jackson's family members and his aunt. Secondly, the jury could have concluded that all codefendants were equally culpable, and although the codefendants testified they were not offered leniency by the State, the *972 jury may have concluded that they would ultimately be treated differently by the State and the Court. In short, the jury may have reasoned that the State would not seek the death penalty against the codefendants so why should the jury return a death verdict in this case. Of course, this is a subjective evaluation of the verdict. Third, based on Burdette's version of the events the jury could have determined that Barnes fired the fatal shot. Fourth, keeping their oath the jury concluded that the mitigating circumstances outweighed the aggravating circumstances.
This kind of analysis fails in the end because the trial judge is always privy to more factual and legal information than the jury. For instance, the Court has the benefit of 1) a presentence investigation; 2) additional evidence from the final sentencing hearing ( 13A-5-47); and 3) legal information in the form of appellate decisions to guide its judgment. With respect to legal information, the Court notes that the jury is not told that there are reported cases that hold that three felony convictions can outweigh the  13A-5-51(1) mitigating factor, or that other courts in similar circumstances have found that a defendant's age of 18 at the time of the offense is not entitled to great weight, or that residual doubt is not a proper consideration in determining the verdict.[10]
The Court has reread its sentencing charge to the jury and it has noted its prejury selection explanation to the venire concerning the procedures in a capital case. The Court has also noted the closing arguments of the attorneys in the sentencing phase of the trial. The Court took pains to emphasize the importance of the sentencing verdict and, in fact, instructed the jury that the jurors were "to assume that what you decide will be the sentence imposed." The Court notes the State did not argue that the verdict was advisory. Therefore, I conclude that the jury was not led to believe that its verdict had lessened importance or did not count.
In the final analysis the Court concludes that the result from the attempt to determine the reliability of the advisory verdict is so uncertain that it is not helpful; and it is unwilling to conclude that the jury departed from its instructions in rendering its verdict. Without some concrete direction from an appellate court, the final conclusion is that the essential function of the advisory verdict is to focus the court in its independent consideration of weighing the aggravating circumstances and weighing the mitigating circumstances, and weighing them against each other.
A clinical judicial evaluation of all the circumstances as enumerated in  V and VI(a) and (b) and weighing the aggravating circumstances and weighing them against the mitigating circumstances, and considering these matters with the 12-0 verdict in the forefront of the Court's deliberations, the Court finds that the two aggravating circumstances outweigh the mitigating circumstances. The appropriate sentence in this case is death.

VII. CONCLUSION
Based on the foregoing findings, it is the judgment of the Court that Shonelle Andre Jackson be punished by death as provided by Ala.Code  15-18-80, -81 and -82.
NOTES
[1] The trial court's sentencing order is attached as an Appendix to this opinion.
[2] In rejecting the mitigating circumstance that the appellant did not have a significant history of prior criminal activity, the trial court specifically noted that the appellant's juvenile record was not a matter to consider in determining whether the circumstance exists. Instead, it found that the appellant did have a significant history of prior criminal activity because he had three prior felony convictions.
[3] As discussed in Part III of this opinion, the trial court properly considered the appellant's juvenile record in determining what weight it would assign to the age mitigating circumstance.
[4] The appellant also argues that Burdette's statement supported his theory that the motive for the killing was retaliation for a bad drug deal and that the killing did not occur during a robbery. However, we have reviewed Burdette's statement, and it does not refer to a bad drug deal. Therefore, this contention is refuted by the record and is without merit.
[5] In so holding, we do not wish to be construed as condoning the judge's conduct in leaving the courtroom. Rather, we admonish trial judges to remain in the courtroom throughout the entire course of a trial.
[1] Antonio Barnes, Eric Williams and Christopher Rudolph were also indicted for this capital offense. They testified against Jackson without any inducement by the State. Each appeared to attempt to lessen their individual culpability and shift blame to the other co-defendants. All had an interest in casting Jackson as the leader and prime culprit.
[2] The evidence established that Barnes is known as a car thief.
[3] This statement is attributed to Jackson by Eric Williams.
[4] Id.
[5] His juvenile record is not a matter to consider when determining whether the circumstance exists. Freeman v. State, 651 So.2d 576 (Ala.Crim.App.1994). Jackson has three prior felony convictions. Windsor v. State, 683 So.2d 1027 (Ala.Crim.App.1994), aff'd, Ex parte Windsor, 683 So.2d 1042 (Ala.1996).
[6] There is also evidence that suggests that Barnes, not Jackson, fired the shot that killed Moore. See infra.
[7] The holding in Roark v. State, 644 N.E.2d 565 (Ind.1994), reh'g denied, ___ N.E.2d ___ (Ind.1995), to some extent, and to a greater extent the holding in Tedder v. State, 322 So.2d 908 (Fla.1975), direct trial judges' consideration of the advisory verdicts in those states. Indiana requires that "at the point of final decision the [trial] court reflect upon the jury recommendation against imposing death." Roark at 570. However, the appellate court's independent review when the jury has recommended life and the trial judge sentences to death is guided by the standard of Martinez Chavez v. State, 539 N.E.2d 4, 5 (Ind.1989), which requires that before the death sentence is affirmed "it must appear... [to the court] that all the facts available in the record point so clearly to the imposition of the death penalty that the jury's recommendation is unreasonable." Roark at 571. It is not unreasonable to consider that an Indiana trial court judge may impose this standard sub silentio. Before a Florida trial judge can override the jury's life verdict, "the facts suggesting a sentence of death should be so clear and convincing that no reasonable person could differ." Tedder at 910.

Thus far Judge Colquitt's expectation that "Alabama appellate courts can reasonably be expected to develop and apply restrictions to a trial judge's power to reflect a sentence recommended by a jury" has not been realized. J.A. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 328 (1982).
[8] The approach would be a neater fit if the jury had returned an advisory verdict recommending death.
[9] The Court is not convinced that indulging in this presumption is realistic. The jury deliberated for 35 minutes before returning its advisory verdict. As observed by Judge James L. Clement in State of Indiana v. Dennis R. Roark, Cause No. 45G04-8902-CF-00017 (Lake County Indiana Superior Court, Criminal Division, October 29, 1992):

"In the death penalty or sentencing state of this trial, the jury deliberated only thirty-five to forty minutes before returning a recommendation that the death penalty not be imposed. I am not suggesting this time of deliberation is a significant factor in my decision, but one has to wonder whether the jury had time to carefully evaluate and balance the aggravating and mitigating circumstances presented to them. Roark at 6."
Of course, it is understandable for a capital juror to retort, as noted by Professor Michel Mello: "If [the trial judge] wasn't going to follow our sentencing verdict, why did he ask us for our opinion in the first place?" M. Mello, The Jurisdiction to do Justice: Florida's Jury Override and The State Constitution, 18 U. Fla. St. L.Rev. 923, 927 (1991).
[10] Indeed, all guilt-phase evidence is introduced at the sentencing phase of the trial and the jury is instructed to consider this evidence.